United States District Court
Southern District of Texas
**ENTERED**
May 15, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| DORA SALIA MALDONADO, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:16-CV-510 |
| | § | |
| RICARDO RODRIGUEZ, JR., *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOOTING
PLAINTIFFS' MOTIONS TO STRIKE AND FOR LEAVE TO AMEND**

**I.     Introduction**

Now before the Court are: the Motion to Dismiss filed pursuant to Federal Rule of Civil

Procedure 12(b)(6) by Defendants Hidalgo County, Texas (the "County") and Ricardo

Rodriguez, Jr. ("Rodriguez"), in his individual and official capacities as Hidalgo County District

Attorney (Dkt. No. 7); and the "Motion to Strike or, Alternatively, Response to Defendants'

Motion to Dismiss, or, Alternatively, Motion to Amend Complaint" filed by Plaintiffs Dora Salia

Maldonado, Dora L. Munoz, Rogelio Cazares, Jr., Jorge A. Salazar, Palmira Munoz, Chris

Yates, and Santos Leal (Dkt. No. 9).  Plaintiffs are seven former County employees allegedly

fired by Rodriguez because they (and in one case, a family member) supported Rodriguez's

opponent, longtime former District Attorney Rene Guerra, in the 2014 election campaign.  (Dkt.

No. 1).  Plaintiffs assert claims under 42 U.S.C. § 1983 for political retaliation in violation of the

First Amendment to the U.S. Constitution.  *Id.*  Defendants now move to dismiss Plaintiffs'

action for failure to state a claim upon which relief can be granted, on the following grounds: (1)

Plaintiffs' claims against the County and Rodriguez in his official capacity should be dismissed

because Plaintiffs' positions are ones that legitimately require political affiliation or loyalty; and

(2) Rodriguez in his individual capacity is entitled to qualified immunity.  (Dkt. No. 7).  In their response, Plaintiffs move to strike certain statements in Defendants' Motion to Dismiss and also ask that they be given leave to amend their pleading should the Court determine that their current allegations are insufficient to state a claim against Defendants.   (Dkt. No. 9).   Upon consideration of the Motions and the parties' responsive briefing (Dkt. Nos. 7, 9, 13), the Court finds that Defendants' Motion to Dismiss must be denied and Plaintiffs' Motions to Strike and for Leave to Amend are moot, for the following reasons.

## II.   Overview of Plaintiffs' Factual Allegations[1]

### A.   Facts Common to All Plaintiffs

Plaintiffs' Original Complaint, their live pleading, alleges that the elected position of Hidalgo County District Attorney (also referred to herein as "DA") was held by Rene Guerra from 1982 to the end of 2014.  (Dkt. No. 1 at ¶ 12).  Defendant Rodriguez ran against and defeated Guerra in the 2014 election, and took office as the new DA on or about January 1, 2015. *Id.*

Plaintiffs were all County employees working for the DA's office at the time Rodriguez took office, and were fired shortly thereafter.  According to the Complaint, each Plaintiff's support of Guerra during the 2014 campaign was "well-known" or "widely known" to the community and to Defendants.  *Id.* at ¶¶ 28, 36, 49, 54, 65, 73, 82.  Plaintiffs also contend that the job held by each at the time of firing "was not the type of job where political allegiance to Rodriguez was necessary to the effective formation and administration of [Defendants'] policies." *Id.* at ¶¶ 23, 38, 46, 53, 62, 72, 81.  Further, Plaintiffs' job duties were "ministerial" in nature and their decisions did not create or implement policies, "[n]or did [they] have discretion

---

[1]   The Court's recitation of the facts omits those allegations pertinent only to the issue of whether Plaintiffs' employment was terminated because of their political support of Rodriguez, and focuses on those facts relevant to the contested issues raised in the Motion.

in the performance of [their] duties or in selecting what duties to perform that were not severely limited by statute, regulation, or policy determinations made by [Defendants] or any supervisor." *Id.*

**B.     Facts Specific to Each Plaintiff**

**1.     Dora Salia Maldonado**

Maldonado was a County employee for over 20 years, from February 6, 1995 through August 7, 2015, and held a number of positions during her employment: Administrative Assistant Auditor for the District Clerk's Office, Assistant Court Coordinator for the 398th Judicial District Court, Court Coordinator for the 389th Judicial District Court, Legal Secretary, Legal Assistant, and most recently Administrative Assistant III at the DA's office from March 28, 2011 until her termination. *Id.* at ¶ 35. In her last two years of employment, Maldonado was the sole employee responsible for structuring the Civil Asset Forfeitures Section's computer software transition, an "expansive procedure requiring that Maldonado create and upload forms from Ableterm to the new computer system Odyssey." *Id.* at ¶ 37.

Maldonado alleges that she openly supported Guerra's 2014 reelection campaign in the following ways:

- Co-hosting a fundraiser for Guerra with her father-in-law;
- Posting a sign in her front lawn;
- Volunteering at polling sites in support of Guerra;
- Decorating and attending Guerra's 2014 campaign kickoff;
- Appearing as a supporter in several photographs on the campaign's Facebook page;
- Displaying a bumper sticker on her personal car; and
- Wearing campaign t-shirts and caps off duty, and in public and on social media.

*Id.* at ¶ 36.

Shortly after Rodriguez took office, he allegedly "focused an inordinate amount of pressure on Maldonado" to complete the computer software transition, to the point that "her need

to respond to the frequent demands began interfering with her ability to complete the project." *Id.* at ¶ 39.  According to Maldonado, "[h]er work was proceeding on schedule and there was no pressing need for its completion sooner than had been projected." *Id.*  The "ulterior" motive for the pressure placed on her allegedly became clear on August 8, 2015, when she was fired after she had finished the transition and her continued employment "was no longer necessary to complete this essential project." *Id.*

## 2.     Dora L. Munoz

Dora L. Munoz ("Munoz" or "Dora Munoz")[2] was hired by DA Guerra in 1992 as a Criminal Investigator.  *Id.* at ¶ 17.  In 1997, she was assigned as a Task Force Agent with the Hidalgo County High Intensity Drug Trafficking Area Task Force ("HIDTA").  *Id.* at ¶ 18. Hidalgo County HIDTA was established in 1992 pursuant to an agreement between the DA's Office and South Texas HIDTA, as a joint effort to disrupt and dismantle drug trafficking organizations in the area.  *Id.* at ¶ 19.  On January 1, 2005, Munoz was promoted to the position of Commander of HIDTA.  *Id.* at ¶ 22.  Munoz's duties and responsibilities as Commander included "executive management authority over all task force administrative and enforcement operations, asset forfeiture, drug awareness, and intelligence units," review and approval of "all operational plans to ensure the safety and well-being of the public, task force officers, covert operatives, law enforcement personnel, and targets," "tactical and strategic leadership," and "presid[ing] over briefings and debriefings of all operations."  *Id.* at ¶ 24.  While holding this position, Munoz allegedly established a close working relationship with federal, state, and local law enforcement agencies, the community, and the media.  *Id.* at ¶ 22.

Munoz alleges that Guerra served as DA for 32 years, and that Munoz was an employee

---

[2]  When necessary to distinguish between Plaintiffs Dora Munoz and Palmira Munoz, the Court will use their full names.

of the DA's office for 23 of those years.  *Id.* at ¶ 27.  Munoz "held [Guerra] in the highest regard, respected his professionalism and commitment to serving the community, and wanted him to continue in that position of responsibility."  *Id.*  Accordingly, Munoz openly supported Guerra's 2014 reelection bid in the following ways:

- Posting signs in her front lawn;
- Wearing campaign t-shirts while off duty and in public;
- Accompanying Guerra to debates against Rodriguez;
- Displaying a bumper sticker on her personal car;
- Going door-to-door in the community to solicit support for Guerra's campaign; and
- Appearing as a supporter in several photographs on the campaign's Facebook page.

*Id.* at ¶ 28.

Following Rodriguez's election, but before he took office, Munoz allegedly became aware that Rodriguez intended to fire her and "a host of others" who served under Guerra and supported him in his reelection campaign.  *Id.* at ¶ 29.  On January 2, 2015, just after Rodriguez took the office of DA, Munoz was fired "at the directive of" Rodriguez.  *Id.* at ¶ 30.  Initially, Rodriguez reported to the State of Texas that Munoz's termination from employment was a "dishonorable discharge"—a designation later changed to "honorable" after Munoz filed an appeal with the Texas Commission on Law Enforcement.  *Id.* at ¶ 33.  According to Munoz, "[t]he likelihood of any law enforcement officer obtaining another job in that field with a dishonorable discharge is so slim as to be non-existent."  *Id.*

**3.   Rogelio Cazares, Jr.**

Cazares was employed by the County in the DA's office from August 1983 through January 28, 2015.  *Id.* at ¶ 60.  He began his employment as a Clerk, and eventually progressed to the position of Human Resource Coordinator.  *Id.*  In this position, Cazares had the responsibility of assisting employees with information regarding payroll, benefits, and other County policies.  *Id.* at ¶ 61.  He was also responsible for helping Assistant District Attorneys

with computer, video, and photo displays for trial, and for "the moving of criminal case file (sic) for morning court dockets." *Id.* Cazares reported to his supervisor, Homer Vazquez, the Chief Deputy Assistant District Attorney. *Id.*

Cazares alleges that he openly supported Guerra's 2014 reelection campaign by:

- Assisting with the campaign kickoff party;
- Assisting the campaign with putting up yard signs;
- Passing out bumper stickers; and
- Visiting and volunteering time at polling stations.

*Id.* at ¶ 65. On January 28, 2015, Cazares was terminated at the directive of Rodriguez. *Id.* at ¶ 64.

**4.    Jorge A. Salazar**

Salazar was employed by the County in the DA's office from September 19, 2005 through March 11, 2015, as a Hot Checks Division Investigator. *Id.* at ¶¶ 78, 79. His job responsibilities included investigating certain assigned criminal activities and performing supplementary investigations to assist prosecutors in case preparation. *Id.* at ¶ 80. He also prepared and executed search warrants and arrest warrants, and served subpoenas. *Id.* Salazar allegedly supported Guerra in his bid for reelection in 2014 by attending campaign events, "block walking," and putting up signs. *Id.* at ¶ 82. On March 11, 2015, Salazar was fired at the directive of Rodriguez. *Id.* at ¶ 84.

**5.    Palmira Munoz**

Palmira Munoz ("Munoz" or "Palmira Munoz"),[3] the sister of Dora Munoz, was an employee of the County from 2000 to 2005. *Id.* at ¶¶ 52, 56. She was later rehired and worked as an Intelligence Analyst in the DA's office from April 9, 2007 through January 8, 2015. *Id.* at ¶ 52. Munoz's job duties included analyzing and interpreting legal documents and "responding

---

[3] *See supra* n. 2.

to most sensitive inquiries of complaints." *Id.*  Munoz alleges that like her sister, she had "secret clearance." *Id.* at ¶ 55.

Munoz allegedly supported Guerra in the 2014 election by attending his campaign kick-off party. *Id.* at ¶ 54.  She also alleges that it was widely known that in prior elections, she had worn t-shirts and displayed bumper stickers supporting Guerra's reelection. *Id.*  Further, "because of her association with her sister, [Defendants] assumed that her political views were consistent with those of her sister." *Id.* at ¶ 56.  On January 8, 2015, Munoz was fired at the directive of Rodriguez. *Id.* at ¶ 57.

**6.     Chris Yates**

Chris Yates was employed by the County in the DA's office from March 2005 through January 8, 2015. *Id.* at ¶ 42.  He was hired as a Criminal Investigator Task Force Agent, became a Field Supervisor, and was later promoted to Assistant Commander of HIDTA. *Id.* at ¶ 44. Yates's responsibilities in HIDTA were intelligence, security, "TCIC/NCIC,"[4] working as a Task Force Officer, and assisting the Commander. *Id.* at ¶ 45.  Yates claims that like Dora Munoz, he "worked primarily with and reported within the organizational framework of the Task Force; he had few dealings with the District Attorney's command staff in his day-to-day work." *Id.* at ¶ 48.

Yates alleges that he openly supported Guerra in the 2014 campaign by endorsing Guerra and telling people to vote for him, and also that it was widely known that in past elections, Yates had supported Guerra by wearing campaign t-shirts and passing out bumper stickers. *Id.* at ¶ 49. On or about January 8, 2015, Yates was fired at the directive of Rodriguez. *Id.* at ¶ 50.

---

[4]   To the Court's best knowledge, this acronym stands for Texas Crime Information Center/National Crime Information Center.

7.    **Santos Leal**

Leal was employed by the County in the DA's office from December 2012 through January 2015. *Id.* at ¶ 68. He was hired as an Investigator whose duties consisted of investigating all cases that came into the DA's office and preparing those cases for court. *Id.* at ¶ 71. He also "helped out HIDTA if needed, and [with] any other assignments that came up." *Id.* Leal's support for Guerra during the 2014 reelection campaign allegedly included the following:

- Attending campaign events;
- Assisting the campaign with putting up yard signs;
- Going door-to-door informing citizens of Guerra's qualifications;
- Passing out bumper stickers;
- Appearing as a supporter in several photographs on the campaign's Facebook page; and
- Volunteering time at polling stations.

*Id.* at ¶ 73. On January 8, 2015, Leal was fired at the directive of Rodriguez. *Id.* at ¶ 75.

## III.    Rule 12(b)(6) Standard of Review

A party may move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) is read in conjunction with the pleading standard set forth in Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-68 (2009). This standard does not require detailed factual allegations. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However, a party's "obligation to provide the 'grounds' of his 'entitle[ment]' to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). To survive a Rule 12(b)(6) motion, the complaint and any other matters properly considered[5] must contain

---

[5]   "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the pleaded factual content allows the court, drawing upon its "judicial experience and common sense," to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* at 678 (citing *Twombly*, 550 U.S. at 556), 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

## IV. Analysis

### A. Plaintiffs' Motion to Strike

As an initial matter, the Court addresses Plaintiffs' Motion to Strike "conclusory" and "unsupported" statements of fact offered by Defendants in support of their Motion to Dismiss. (Dkt. No. 9 at § I). The Court recognizes that most of the statements to which Plaintiffs object are statements of fact (such as formal job descriptions) not contained in or reasonably encompassed by Plaintiffs' pleading, and therefore not relevant to the Court's determination of whether Plaintiffs have stated a claim under Rule 12(b)(6). *See id.* (statements identified by Plaintiffs on p. 1 and ¶¶ 8-12 of Defendants' Motion).[6] However, the Court need not formally strike these statements; it merely notes that it will not consider them in resolving the Motion. Other statements to which Plaintiffs object—that Dora Munoz, Yates, Salazar, and Leal

---

notice.'" *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir.2008)); *see also Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (court's review on 12(b)(6) motion "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.").

[6] The Court recognizes that it may construe from the pleaded description of Dora Munoz's duties that she occupied a high-level position, but at this stage need not accept Defendants' contention that Munoz was considered the DA's "Number Two in the chain of command." *See* (Dkt. No. 7 at ¶ 8).

represented the DA in the eyes of the public, and that a breach of their duties could expose the DA to personal liability—will be addressed by the Court herein.  *See* (Dkt. No. 9 at § I) (statements identified by Plaintiffs in ¶ 7 of Defendants' Motion).

**B.      Defendants' Motion to Dismiss**

**1.      Overview of Plaintiffs' § 1983 Claims**

Section 1983 provides a claim against any "person" who, "under color of any statute, ordinance, regulation, custom, or usage, of any State," violates another's rights under the U.S. Constitution. 42 U.S.C. § 1983; *e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). To state a § 1983 claim, "a plaintiff must (1) allege a violation of a right secured by the Constitution…and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley*, 726 F.3d at 638 (quoting *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008)). A plaintiff may bring a § 1983 claim against a person in his individual or official capacity, or against a local government entity. *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipalities and other local government units are "persons" subject to suit under § 1983). A § 1983 suit against a person in his official capacity is a suit against his office, and is no different from a suit against the entity itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Monell*, 436 U.S. at 690 n.55).

Here, Plaintiffs have sued the County and Rodriguez in his individual and official capacities for violations of Plaintiffs' asserted rights, secured by the First Amendment to the U.S. Constitution, to "freedom of speech, which includes the right to engage in political activities, to campaign and run for public office, and to associate with an individual exercising [the] right to freedom of speech." (Dkt. No. 1 at ¶ 87). More specifically, Plaintiffs contend that Defendants

retaliated against them in violation of their First Amendment rights by firing Plaintiffs due to their (or in Palmira Munoz's case, her sister Dora Munoz's) political support for Rodriguez's opponent in the 2014 campaign for the office of Hidalgo County DA.  *Id.* at ¶¶ 88-89.

**2.      Claims against County and Rodriguez in His Official Capacity**

**a.      Overview of Applicable Law**

Defendants first move to dismiss Plaintiffs' § 1983 claims against the County and Rodriguez in his official capacity on the asserted basis that, even assuming Plaintiffs were fired for their political allegiance to Guerra, the adverse actions taken against them do not give rise First Amendment liability because Plaintiffs' jobs were "ones that legitimately require political affiliation or loyalty" to Rodriguez.  (Dkt. No. 7).  The U.S. Supreme Court has consistently held that "the First Amendment forbids government officials to discharge…public employees solely for not being supporters of the political party in power, *unless* party affiliation is an appropriate requirement for the position involved."  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)) (emphasis added).  "Although the Supreme Court's decisions involve party affiliation, [the Fifth] Circuit has recognized that the *Elrod-Branti* doctrine [also] applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party."  *Jordan v. Ector Cty.*, 516 F.3d 290, 295-96 (5th Cir. 2008) (quoting *Correa v. Fischer*, 982 F.3d 931, 935 (5th Cir. 1993)) (internal quotations omitted).  In a separate set of cases, the Supreme Court has also held that the First Amendment precludes the discharge of public employees for exercising their First Amendment right to free speech if two criteria are satisfied: (1) the speech relates to a matter of public concern; and (2) the employee's interest in commenting upon matters of public concern outweighs the employer's interest in promoting the

efficiency of the public services it performs through its employees.  *Brady v. Ft. Bend Cnty.*, 145 F.3d 691, 704 (5th Cir. 1998) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983)).

Interpreting this precedent, the Fifth Circuit "places cases involving only political association, only speech, or a combination of the two on a spectrum."  *Gentry v. Lowndes Cty.*, 337 F.3d 481, 485-86 (5th Cir. 2003) (citing *Kinsey v. Salado Indep. Sch. Dist.*, 950 F.2d 988, 993-94 (5th Cir. 1992) (en banc)).  "Where nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any, weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail."  *Id.* at 486 (citing *Kinsey*, 950 F.2d at 993-94; *McBee v. Jim Hogg Cnty.*, 730 F.2d 1009, 1014 (5th Cir. 1984)) (internal footnote omitted).  On the opposite end of the spectrum are cases where employees' exercise of First Amendment privileges "clearly over-balanced [their] usefulness as [employees]"—for example, "where instructors had incited student disturbances that were sufficiently serious to call in question the ability of the academic authorities to maintain order on campus."  *Brady*, 145 F.3d at 705 (quoting *McBee*, 730 F.2d at 1014); *see also id.* (quoting same).  When cases fall within the spectrum, *Pickering-Connick* balancing constitutes the appropriate inquiry.  *Brady*, 145 F.3d at 705; *see also Gentry*, 337 F.3d at 486.  "[A] number of factors are relevant in balancing the interests of the individual against those of the state, including the following: (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as

hostile, abusive, or insubordinate; [and] (5) whether the activity impairs discipline by superiors or harmony among coworkers." *Brady*, 145 F.3d at 707.

In cases involving public employees who hold policymaker or confidential positions, "the government's interests more easily outweigh the employee's (as a private citizen)." *Id.* at 707-08 (quoting *Kinsey*, 950 F.2d at 994). "A policymaker is an employee 'whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors.'" *Wiggins v. Lowndes Cty.*, 363 F.3d 387, 390 (5th Cir. 2004) (quoting *Stegmaier v. Trammell*, 597 F.2d 1027, 1035 (5th Cir. 1979)). "[C]onsideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Id.* (quoting *Elrod*, 427 U.S. at 368). "An employee is confidential 'if he or she stands in a confidential relationship to the policymaking process, *e.g.*, as an advisor to a policymaker, or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, *e.g.*, as a private secretary to a policy maker." *Id.* at 391 (5th Cir. 2004) (quoting *Stegmaier*, 597 F.2d at 1040). In *Stegmaier*, the Fifth Circuit "added to this definition the possibility that a confidential employee may be one who is in a position to subject an elected official to personal liability." *Id.* (citing same). Ultimately, however, the inquiry "is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that [political] affiliation is an appropriate requirement for effective performance of the public office involved." *Brady*, 145 F.3d at 709 (quoting *Branti*, 445 U.S. at 518).

**b.** **Balancing Test as Applied to Plaintiffs' First Amendment Claims at Rule 12(b)(6) Stage**

Defendants contend that Plaintiffs' pleaded allegations and applicable law demonstrate that at the time of their firings, all Plaintiffs occupied positions that were confidential in nature or otherwise required loyalty to the incoming DA. (Dkt. No. 7).[7] Therefore, Plaintiffs are among those employees subject to political dismissals, and cannot show any violation of their First Amendment rights. *Id.* In response, Plaintiffs argue that the issue of whether they fall within this class of employees is a fact-specific determination inappropriate for resolution at the Rule 12(b)(6) stage. (Dkt. No. 9).

The Court first notes that no Plaintiff is alleged to have been fired solely for his or her private political beliefs, nor does Plaintiffs' alleged political support of former DA Guerra during the 2014 election campaign place them on the opposite end of the spectrum; rather, each occupies a place within that spectrum, necessitating application of the *Pickering-Connick* balancing test. Since application of this test is ultimately a legal determination, the Court must endeavor to determine whether Plaintiffs' pleaded allegations, without additional clarification or development of the factual record, are dispositive. *See Brady*, 145 F.3d at 708 n.7 (balancing test is ultimately legal determination dependent upon particular set of facts). Those allegations reveal that each Plaintiff differs in the extent of his or her involvement in Guerra's bid for reelection, with Maldonado and Dora Munoz taking the most active roles,[8] and Palmira Munoz engaging in the least public display of support: she merely attended a campaign kick-off party. Nonetheless, the nature of Plaintiffs' alleged speech is the same—that is, no Plaintiff is alleged to have engaged in speech or association apart from his or her proactive political support of

---

[7] Defendants do not argue that any of the Plaintiffs occupied policymaking positions.
[8] For example, only Maldonado is alleged to have co-hosted a fundraiser for Guerra's campaign, and only Dora Munoz is alleged to have accompanied Guerra to public debates. Further, both of these individuals allegedly assisted the campaign in multiple other respects.

Guerra or association with a Guerra supporter.  *See Gentry*, 337 F.3d at 488 (in conducting

analysis of nature of plaintiffs' speech, distinguishing between plaintiffs' support of defendant's

political opponent and their opposition to defendant's official actions, which included "his desire

to put his girlfriend on the county payroll and his insistence that county resources be used to

pave a friend's road on private property").   Therefore, the public concerns implicated by

Plaintiffs' First Amendment activity weigh heavily as to all.  *See Elrod*, 427 U.S. at 356

("[P]olitical belief and association constitute the core of those activities protected by the First

Amendment."); *Brady*, 145 F.3d at 707 ("[T]here can be no question that…campaigning for a

political candidate…relate[s] to a matter of public concern.") (quoting *Vojvodich v. Lopez*, 48

F.3d 879, 885 (5th Cir. 1995)).

The Court now turns to the issue most heavily contested by the parties: whether

Plaintiffs' pleading reveals that the nature of the position held by each Plaintiff at the time of

firing tips the balance in Defendants' favor.  Defendants' Motion groups four of the Plaintiffs

into one category, alleging that Dora Munoz, Yates, Salazar, and Leal all occupied the position

of "investigator" for the DA's office at the time their employment was terminated.  (Dkt. No. 7).

According to Defendants, "[b]ecause investigators represent the [DA] in the eyes of the public,

and because a breach of an investigator's duties could expose the [DA] to personal liability,

Rodriguez would have committed no constitutional wrong if he elected to terminate [the

investigator Plaintiffs] for their lack of political allegiance."  *Id.*   However, in so arguing,

Defendants draw chiefly from the Fifth Circuit's analysis of a different exception to liability—

the "personal staff" exception under the Age Discrimination in Employment Act ("ADEA").  *See*

*id.*; *Gunaca v. State of Tex.*, 65 F.3d 467, 469-71 (5th Cir. 1995).[9]  The ADEA makes it unlawful

---

[9]  As noted *infra*, *Gunaca* also analyzed the investigator plaintiff's First Amendment claims against the
defendant DA, but only with respect to the DA's assertion of qualified immunity.  *See Gunaca*, 65 F.3d at

to discharge an employee because of his or her age, but excludes from the definition of "employee" those persons "chosen by [a state elected official] to be on such officer's personal staff." *Gunaca*, 65 F.3d at 469-70 (citing 29 U.S.C. §§ 623(a)(1), 630(f)). "[W]hether the person in the position at issue represents the elected official in the eyes of the public" is the third factor in the test for determining whether the personal staff exception applies, not a factor determinative of whether the person's employment may be terminated for the exercise of his or her First Amendment rights. *See id.* at 470. Moreover, the Fifth Circuit has declined to "create a new category of confidential employees" consisting of those who represent their supervisors when they interact with the public, noting that to do so "would make all [governmental] employees who interact with the public confidential; Defendants must show something more" to demonstrate their exception to liability for First Amendment retaliation under § 1983. *Wiggins*, 363 F.3d at 391. Thus, the Fifth Circuit's determination in *Gunaca* that investigators represent the DA in the eyes of the public does not dispose of the inquiry here. *See id.* at 471.

As did the Court in *Gunaca*, Defendants also point out that by statute in Texas, "[a] prosecuting attorney may employ the assistant prosecuting attorneys, investigators, secretaries, and other office personnel that in his judgment are required for the proper and efficient operation and administration of the office." TEX. GOV'T CODE § 41.102(a); *see id.* The statute further provides that "[a]ll personnel of a prosecuting attorney's office are subject to removal at the will of the prosecuting attorney," TEX. GOV'T CODE § 41.105, and investigators specifically are "under the exclusive authority and direction of the prosecuting attorney" who "is responsible for [their] official acts," *id.* § 41.109(b). *See Gunaca*, 65 F.3d at 471. According to Defendants, these provisions rendered the investigator Plaintiffs capable of exposing Rodriguez to personal

473-75. Defendants' Motion erroneously attempts to extrapolate the Fifth Circuit's findings with regard to the ADEA personal staff exception to the question of whether a First Amendment violation in fact occurred.

liability.  (Dkt. No. 7).  *Gunaca* found the cited provisions dispositive of the first two ADEA personal staff exception factors—whether a Texas DA has plenary powers of appointment and removal, and whether investigators are personally accountable only to the DA—not the reverse question of whether the DA may be held personally liable for his investigators' official acts.  *See Gunaca*, 65 F.3d at 470-71.  Therefore, *Gunaca* lends no direct support to Defendants' argument. In *Stegmaier*, *supra*, in which the Fifth Circuit indicated the relevance of a defendant's potential personal liability for an employee's actions to the First Amendment liability exception at issue here, the Court considered Alabama statutory provisions empowering a deputy clerk to conduct all business which the clerk was authorized to conduct, and expressly subjecting the clerk to civil liability and fines for failure to perform his statutory duties, in concluding that the clerk "must be able to select a deputy in whom he has total trust and confidence and from whom he can expect, without question, undivided loyalty."  *Stegmaier*, 597 F.2d at 1040.  Here, the Texas statutory provision making the DA "responsible" for the official acts of his investigators does not explicitly subject him to civil liability for acts taken in contravention of the DA's directives,[10] and the Court has located no authority indicating that § 41.109(b) serves as a source of any such liability.  Therefore, Rodriguez cannot rely on his alleged personal liability for the official acts of the investigator Plaintiffs in contending that they are employees lawfully subject to dismissal for their political support of the former DA.

The Court therefore turns to the broader question of whether, as Defendants submit, all of the Plaintiffs otherwise occupied confidential positions and/or positions for which political allegiance to Rodriguez was an appropriate requirement for the effective performance of their

---

[10]  If the DA may be held personally liable for the official acts of his investigators taken in *accordance* with his directives, this type of potential liability cannot justify a political dismissal, since it is the DA's interest in employing individuals loyal to him (and presumably, more apt to follow his directives) that provides the justification.

jobs. (Dkt. No. 7). Although Defendants group Dora Munoz, Yates, Salazar, and Leal together as "investigators," each held a different title at the time of firing: Dora Munoz was employed as Commander of HIDTA, Yates as Assistant Commander of HIDTA, Salazar as a Hot Checks Division Investigator, and Leal as an Investigator who also helped out with HIDTA. The remaining Plaintiffs held varied positions: Maldonado was employed as an Administrative Assistant III, Cazares as Human Resources ("HR") Coordinator, and Palmira Munoz as an Intelligence Analyst. The Court first notes that no existing precedent directly holds that any of these jobs are subject to political dismissals. Although the terminated employee in *Gunaca* was an investigator for a Texas DA, the Court there was concerned only with whether the DA was entitled to qualified immunity from First Amendment liability, discussed more fully *infra*, not whether a constitutional violation had actually occurred. *See Gunaca*, 65 F.3d at 473-75.[11]

In arguing that the Court may nonetheless hold that Plaintiffs' jobs were confidential in nature or otherwise of the type justifying political dismissals, Defendants rely heavily on allegations that may not be considered at the Rule 12(b)(6) stage—namely, formal job descriptions not contained in or reasonably encompassed by Plaintiffs' pleading. Looking only to Plaintiffs' pleaded allegations, the Court concludes that it cannot make an affirmative legal determination that Plaintiffs fall within that "exceptional class of public servants of whom political allegiance may be demanded." *Brady*, 145 F.3d at 709 (quoting *Garcia v. Reeves Cnty.*, 32 F.3d 200, 205 (5th Cir. 1994)). HIDTA Commander Dora Munoz and, to a lesser extent, Assistant Commander Yates may have occupied managerial positions within the DA's office, but they are also alleged to have "reported primarily within the organizational framework of the Task

---

[11] In its qualified immunity analysis, *Gunaca* did not consider whether the investigator represented the DA in the eyes of the public, or could subject the DA to personal liability; again, these were factors considered in the context of the Court's application of the ADEA personal staff exception. *See Gunaca*, 65 F.3d at 473-75.

Force."[12]   The extent to which the DA served as the policymaker with respect to the activities of HIDTA has bearing on whether these employees "stood in a confidential relationship to the policymaking process," *i.e.*, as advisors to the DA as policymaker, and cannot be ascertained from the pleaded allegations.   Further, the extent to which managerial employees such as Munoz and Yates had the power to advance or undermine the DA's policies is relevant to the determination of whether they fall within the excepted class of public employees, and cannot be determined from Plaintiffs' pleading alone.   *See Gentry*, 337 F.3d at 488 (at summary judgment stage, determining that county road manager and county administrator could be fired for their support of political opponent of president of county board of supervisors, in part because plaintiffs' "critical managerial roles in county government" enabled them "to advance the board's policies, if they act[ed] faithfully, or to undermine those policies by overt or covert opposition," creating "strains that could easily disrupt and prevent the effective performance of public services"); *Kinsey*, 950 F.2d at 996 (quoting *Gonzalez v. Benavides*, 712 F.2d 142, 149 (5th Cir. 1983)) (affirming district court's judgment notwithstanding the verdict that school superintendent's political opposition to slate of candidates elected to school board was justification for newly elected board to relieve him of his duties, in part because he "possessed the power to 'make or break' Board policies which 'arguably afforded him the opportunity to thwart or to forward [its] goals'"); *see also Wiggins*, 363 F.3d at 391-92 (distinguishing employees in *Gentry* and *Kinsey* from lower-level employees whose sabotage of their own work would merely render their work deficient, not advance or undermine policy to the requisite degree).   Moreover, the Court notes that even if Dora Munoz was subject to a political dismissal, Plaintiffs have also pleaded that Rodriguez reported to the State that Munoz was "dishonorably

---

[12]   It is unclear whether "Task Force" pertains solely to HIDTA within the DA's office, or the alleged joint effort with "South Texas HIDTA."

discharged." Whether this is the type of adverse action that, if taken against Munoz by reason of her political support of the former DA, could give rise to a First Amendment claim, is a question that Defendants' Motion does not address.

With respect to the other Plaintiffs, the Court cannot determine from the pleaded allegations whether they occupied confidential roles with respect to the policymaking process; although each may have had access to documents and materials considered "confidential," the relevant inquiry is whether those documents were ones "embodying policymaking deliberations and determinations" to the extent that loyalty to Rodriguez was necessary for the effective delivery of the public services provided through their jobs. Absent development of the factual record, the Court cannot pronounce the outcome of the balancing test for any of the Plaintiffs, and therefore cannot dismiss Plaintiffs' official-capacity claims on the asserted basis that no First Amendment violation has occurred.

## 2.    Qualified Immunity from Individual Capacity Claims

### a.    Overview of Applicable Law

Nonetheless, precisely because liability turns on application of a fact-intensive balancing test, Defendants' Motion also requests dismissal of Plaintiffs' claims against Rodriguez in his individual capacity on the grounds that he is entitled to qualified immunity from suit. (Dkt. No. 7). The defense of qualified immunity "protects government officials from civil damages liability [under § 1983] when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). A plaintiff seeking to overcome this defense must show: (1) that the official violated a constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct. *Id.* at 371 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts have discretion to decide which prong to

address first. *Id.* With regard to the second prong, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In other words, existing precedent must have placed the…constitutional question confronted by the official beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741) (internal quotations omitted). For this reason, courts are cautioned "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (quoting *al-Kidd*, 563 U.S. at 742) (internal citation and quotations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

b.     **Qualified Immunity from Plaintiffs' First Amendment Claims at Rule 12(b)(6) Stage**

In the context of First Amendment political dismissal claims, the Fifth Circuit has observed that because consideration of such claims "involves a case-specific balancing of the employee's First Amendment rights and the government's interest[s]," "'[t]here will rarely be a basis for *a priori* judgment that the termination or discipline of a public employee violated clearly established constitutional rights.'" *Gunaca*, 65 F.3d at 474 (quoting *Noyola v. Tex. Dep't*

*of Human Res.*, 846 F.2d 1021 (5ᵗʰ Cir. 1988)) (some internal quotations omitted).  By 1995, when *Gunaca* was decided, "both the Supreme Court and the Fifth Circuit had recognized a class of public employees from whom political allegiance may be demanded: public employees whose First Amendment interests are outweighed by a governmental interest in the employees' political loyalty."  *Id.* (citing *Branti*, 445 U.S. at 518; *Vojvodich*, 48 F.3d at 887).  With respect to the First Amendment claim of the plaintiff, a Texas DA's office investigator allegedly fired for his support of the outgoing DA, the Court reasoned:

> The right that [the plaintiff] asserts in his complaint and summary judgment response was not clearly established at the time [the incoming DA] allegedly violated it because neither the Fifth Circuit nor the Supreme Court had addressed the issue of political patronage in the hiring or firing of investigators in district attorneys' offices, and neither had addressed an issue sufficiently analogous that a reasonable official would understand from its resolution that it is a First Amendment violation to dismiss or to not hire an investigator on the grounds that the investigator supported the campaign of the official's opponent.

*Id.* at 475.  Since "reasonable public officials could have differed on the lawfulness of [the DA's] actions at the time they occurred," the Fifth Circuit held that the DA was entitled to qualified immunity.  *Id.*  However, it is important to note that the Court did so at the summary judgment stage, and in the absence of any argument or evidence offered by the plaintiff "that would have supported a claim that the position of investigator does not fall under the [*Branti*] exception."  *Id.* at 474 n.6.  In other words, the Court lacked any basis to address application of the *Pickering-Connick* balancing test, rendering the plaintiff's job title dispositive of the qualified immunity inquiry.

Here, in contrast, Plaintiffs' pleading and response offer allegations and argument that their jobs do not fall within the exception to First Amendment liability to which Rodriguez appeals.  Thus, although the Fifth Circuit has yet to address "the issue of political patronage" in

the firing of an employee occupying any of the specific positions held by Plaintiffs,[13] the Court agrees with Plaintiffs that the absence of such precedent does not dispose of the qualified immunity inquiry at this stage.  Moreover, Plaintiffs assert that sufficiently analogous precedent exists in decisions post-dating *Gunaca*—namely, the Fifth Circuit's decisions in *Brady*, *supra*, in which it held that the *Pickering-Connick* balancing test weighed in favor of Texas sheriff's deputies[14] fired for their political support for the former sheriff in his bid for reelection, and *Cox v. Kaelin*, 577 F. App'x 306, 313 (5th Cir. 2014), in which the Court found it at least plausible that the defendant sheriff had violated his sheriff deputy's clearly established First Amendment right to be free from demotion and discharge by reason of political affiliation.  (Dkt. No. 9).  Like that of the sheriff's deputies in *Brady*, Plaintiffs' alleged political activity apparently took place off-duty and consisted of proactive support for the defendant's political opponent rather than negative opposition to the defendant.  *See Brady*, 145 F.3d at 709.  These factors in *Brady*, when considered in combination with the defendant sheriff's testimony that political support for him was not a necessary requirement for the plaintiffs' jobs, led the Fifth Circuit to conclude that *even if the sheriff's deputies were policymakers*, their "interest in political activity in support of [the former sheriff] outweighed the County's interest in efficiency in the services that it provides through its employees because any negative impact that the [deputies'] activity could have had

---

[13]  The Fifth Circuit *has* addressed this issue in the context of the firing of a DA's office employee, but not in a manner that offers support to either side in the qualified immunity analysis.  That is, in *Aucoin v. Haney*, 306 F.3d 268 (5th 2002), the Fifth Circuit's holding that a Louisiana DA was entitled to qualified immunity from liability for the alleged political dismissal of an assistant district attorney ("ADA"), was reliant upon the status of ADAs as "policymakers" under Louisiana law, as well as the Court's observation that ADAs "perform *all* the functions [the DA] performs," making their loyalty to the DA "essential."  *Id.* at 276 (emphasis added).  Plaintiffs here are not alleged to have the same identity of functions, nor have Defendants argued that Plaintiffs are policymakers under Texas law.

[14]  The seven sheriff's deputy plaintiffs in *Brady* held various additional titles at the time of firing: lieutenant of the sheriff's department detective bureau, detective sergeant in narcotics, patrol sergeant, lieutenant in charge of the county jail, sergeant, patrol deputy, and sergeant who supervised the warrants division.  *Brady*, 145 F.3d at 697.

on the efficiency of the sheriff's department was minimal, if their activity could have created any such impact at all." *Id.* at 708-10.  Although this Court lacks the benefit of the key admission by the individual defendant in *Brady*, it finds that the balancing test factors disposed of by that admission cannot be resolved on the basis of Plaintiffs' pleaded factual allegations and job descriptions. *See Brady*, 145 F.3d at 710 (sheriff's admission indicated that plaintiffs' political activity in support of former sheriff "had little if any potential for undermining close working relationships within the sheriff's department or for impairing discipline by superiors or harmony among coworkers within the department").  Rather than serve a basis for qualified immunity, this uncertainty calls into question whether reasonable DAs in Rodriguez's position could have differed on whether Plaintiffs' alleged off-duty, proactive support for the former DA could have negatively impacted the efficiency of the public services provided through their specific jobs. Although *Cox* did not rely on *Brady* in denying qualified immunity at the Rule 12(b)(6) stage, the decision is instructive in its post-*Gunaca* observation that the *Pickering-Connick* balancing test, "being the factually-sensitive balancing test that it is, implicates only the summary judgment, not failure to state a claim, analysis." *Cox*, 577 F. App'x at 312 (quoting *Kennedy v. Tangipahoa Par. Library*, 224 F.3d 359, 366 n.9 (5th Cir. 2000)).  The Court finds that Plaintiffs have at least stated a plausible claim that every reasonable DA in Rodriguez's position would have known that the *Pickering-Connick* factors balanced in each Plaintiff's favor, and will deny Defendants' Motion without prejudice to their ability to re-urge the defense of qualified immunity upon further development of the factual record.

## V.    Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Defendants' Motion to Dismiss is **DENIED** without prejudice to reasserting the defense of qualified immunity at a later

date.  Also for the foregoing reasons, Plaintiffs' Motions to Strike and for Leave to Amend are **MOOT**.

SO ORDERED this 15th day of May, 2017, at McAllen, Texas.

Randy Crane
United States District Judge