United States District Court
Southern District of Texas
**ENTERED**
March 08, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| DORA SALIA MALDONADO, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 7:16-CV-510 |
| | § | |
| RICARDO  RODRIGUEZ, JR., *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
MOOTING PLAINTIFFS' MOTION TO STRIKE AND FOR SANCTIONS**

**I.     Factual and Procedural Background**

Now before the Court are: (1) the Motion for Summary Judgment filed pursuant to

Federal Rule of Civil Procedure 56 by Defendants Hidalgo County, Texas (the "County") and

Ricardo Rodriguez, Jr. ("Rodriguez"), in his individual and official capacities as Hidalgo County

District Attorney ("DA") (Dkt. No. 24); and (2) the "Motion to Strike the Majority of the

Defendants' Proffered Evidence under Both the Rules of Evidence and as Sanctions,"[1] filed by

Plaintiffs Dora Salia Maldonado, Dora L. Munoz, Rogelio Cazares, Jr., Jorge A. Salazar, Palmira

Munoz, Chris Yates, and Santos Leal (Dkt. No. 36).   Plaintiffs are seven former County

employees allegedly fired by Rodriguez because they supported his opponent, longtime former

DA Rene Guerra, in the 2014 election campaign.  (Dkt. No. 1).  Plaintiffs assert claims under 42

U.S.C. § 1983 for political retaliation in violation of the First Amendment to the U.S.

Constitution.  *Id.*

---

[1]   Although the Motions' title refers to "the Rules of Evidence," Plaintiffs actually seek the requested
relief under the Federal Rules of Civil Procedure.

Plaintiffs filed their Original Complaint in this Court on August 24, 2016.  (Dkt. No. 1).
On September 23, 2016, prior to the initial pretrial and scheduling conference, Defendants
moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) on the
following grounds: (1) Plaintiffs' jobs are ones that legitimately require political affiliation with
or loyalty to Rodriguez, and therefore Defendants are excepted from liability if Rodriguez in fact
terminated Plaintiffs for their support of the outgoing DA; and (2) Rodriguez in his individual
capacity is entitled to qualified immunity.  (Dkt. No. 7).  At the initial conference on November
2, 2016, the Court informed the parties of its initial impression that Defendants' arguments in
support of dismissal were better suited for the summary judgment stage, and tentatively placed
the case on a scheduling order with a discovery deadline of March 31, 2017.  *See* (Dkt. No. 14);
11/02/2016 Minute Entry.  As that deadline neared, and upon Defendants' request, the Court
stayed the discovery and remaining deadlines in the scheduling order pending the Court's formal
ruling on the motion to dismiss.  (Dkt. No. 18).

By order entered on May 15, 2017, the Court denied the motion to dismiss, finding that
the issues of whether each Plaintiff was the type of public employee lawfully subject to a
political dismissal, and whether Rodriguez in his individual capacity is entitled to qualified
immunity, could not be decided absent "further development of the factual record."  (Dkt. No.
19).  At a status conference on July 6, 2017, counsel informed the Court that some discovery had
occurred, and that Defendants wished to move for summary judgment on the defense of qualified
immunity before proceeding to full discovery on the merits.  *See* 07/06/2017 Minute Entry.  The
Court ordered Defendants to file their motion for summary judgment within the next week, after
which the Court and parties could better determine the scope of discovery necessary to address
the motion.  Defendants filed the instant Motion for Summary Judgment on July 14, 2017,

reiterating both arguments advanced in support of the motion to dismiss and adding another: that no evidence exists that Rodriguez knew of Plaintiffs' alleged political activities in support of former DA Guerra.  (Dkt. No. 24).  Defendants support their Motion with the affidavits of Rodriguez and two individuals designated under Federal Rule of Civil Procedure 30(b)(6) as witnesses for the County: Juan P. Sifuentes, who holds Plaintiff Dora Munoz's former job as the County's High Intensity Drug Trafficking Areas ("HIDTA") Task Force Commander; and Juan Villescas, who currently serves as the County's First Assistant Criminal District Attorney.  (*Id.*, Exhs. 1-3).  On July 26, 2017, Defendants moved for a protective order from full merits discovery, and after hearing the arguments of counsel at a status conference the next day, the Court ordered that discovery limited to the issues raised by the Motion for Summary Judgment proceed with: (1) the agreed upon supplementation of written discovery; (2) the production of certain personnel records, subject to a protective order; and (3) the agreed upon production of certain witnesses for deposition (Rodriguez and additional Rule 30(b)(6) witnesses).  (Dkt. Nos. 25, 27); 07/27/17 Minute Entry.

The Court ordered Plaintiffs to respond to Defendants' Motion for Summary Judgment by October 18, 2017, and after being granted two extensions of time, Plaintiffs filed their response on November 6, 2017.  (Dkt. No. 27, 33, 35, 37).  On the same date, Plaintiffs filed the instant Motion to Strike and for Sanctions, asking the Court to sanction Defendants' alleged failure to produce competent Rule 30(b)(6) witnesses by "prohibiting [Defendants] from introducing any evidence"—in particular, the affidavits offered in support of Defendants' Motion for Summary Judgment—"that refutes, supplements, or otherwise changes the testimony that [those] witnesses presented under oath about the plaintiffs and their job duties, responsibilities, and authority."  (Dkt. No. 36).  Plaintiffs also ask the Court to strike certain statements in the

Rule 30(b)(6) witness affidavits as conclusory, or because the witnesses lack personal knowledge to make such statements. *Id.* Upon consideration of the Motions, the parties' responsive briefing and objections (Dkt. Nos. 37, 47, 48, 50, 51),[2] and the evidence submitted,[3] in light of the relevant law, the Court finds that the Motion for Summary Judgment must be denied, and that the Motion to Strike and for Sanctions is moot.

## II.   Summary Judgment Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c). In

---

[2]   Almost four months after the filing of Plaintiffs' response to Defendants' Motion for Summary Judgment, Defendants filed objections to certain statements contained within Plaintiffs' sworn declarations attached to their response. (Dkt. No. 50). With a single exception, discussed at *infra* n. 20, the Court has not relied on these statements in ruling on the Motion, and therefore Plaintiffs' objections are moot.

[3]   The summary judgment evidence consists of Defendants' Exhibits 1 through 3 and Plaintiffs' "Attachments" 1 through 16, as substituted. *See* (Dkt. No. 24, Exhs. 1-3; Dkt. No. 37, Attachments 1-7 and 9-16; Dkt. No. 42, Attachment 8; Dkt. No. 44). The evidence offered in support of and in opposition to the Motion to Strike and for Sanctions is comprised of Plaintiffs' Attachments 1 through 6 and 8 through 10, as substituted, and Defendants' Exhibits 1 through 7. *See* (Dkt. No. 36, Attachments 1-6, 8-10; Dkt. No. 36-1 (noting that Attachment 7 was intentionally omitted); Dkt. No. 44; Dkt. No. 47, Exhs. 1-7). To the extent that the parties have submitted overlapping exhibits, the Court will cite only to the Attachment submitted by Plaintiffs.

conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006).   However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

### III.    Plaintiffs' Motion to Strike and for Sanctions

The Court first addresses the merits of Plaintiffs' objections, via their Motion to Strike and for Sanctions, to the evidence offered by Defendants in support of the Motion for Summary Judgment.  By way of background, the Court notes that in the course of the parties' efforts to conduct discovery relevant to the issues raised by the Motion for Summary Judgment, and pursuant to Rule 30(b)(6), the County designated and Plaintiffs deposed six witnesses who testified on the County's behalf as to 28 of the 54 topics (excluding subparts)[4] noticed by Plaintiffs in their "Fifth Amended Notice of Deposition of Defendant Hidalgo County."  *See* (Dkt. No. 36, Attachments 1, 4; Attachment 2, CANTU DEP. (Topics 2, 7M, 7N, 13, 18, 19, 21-23, 30, 38, 39); Attachment 3, RAMIREZ DEP. (Topics 2, 7B, 7H, 7I, 7M, 31)[5]; Attachment 5, SCHREIBER DEP. (Topics 34, 35); Attachment 6, SIFUENTES DEP. (Topics 7C-F, 7H, 7K, 7L, 18,

---

[4]  Topic 7 is divided into 15 subparts, referenced by defense counsel and this Court as Topics 7A through 7O.  *See* (Dkt. No. 36, Attachments 1, 4).

[5]  Although the County initially designated Josephine Ramirez to testify as to Topic 7L, defense counsel withdrew this designation at her deposition.  (Dkt. No. 36, Attachment 3, RAMIREZ DEP. at p. 8; Attachment 4).

19, 21-29, 32, 33, 36, 37); Attachment 9, VILLESCAS DEP. (Topics 4, 7A, 7J, 7O, 8, 11, 18, 19, 21-23); Dkt. No. 47, Exh. 5, GUERRERO DEP. at p. 6)[6].[7]   Two of these witnesses, Sifuentes and Villescas, are the affiants whose statements constitute Defendants' evidence on one of the issues raised by the Motion for Summary Judgment: whether each Plaintiff was the type of employee who may be dismissed for political reasons without offending the First Amendment.   *See* (Dkt. No. 24, Exhs. 2, 3).

Through their Motion to Strike and for Sanctions, Plaintiffs first argue that the Rule 30(b)(6) witnesses designated to offer testimony on topics pertaining to (1) Plaintiffs' job duties and responsibilities and (2) Defendants' contention that Plaintiffs' jobs required political allegiance to Rodriguez were so unprepared, and their testimony so inadequate, that the Court should consider their testimony as a sanctionable failure to appear for their depositions.   (Dkt. No. 36 at § I); *see Resolution Tr. Corp. v. S. Union Co.*, 985 F.2d 196, 197-98 (5th Cir. 1993) (if Rule 30(b)(6) witness "is not knowledgeable about relevant facts, and the [entity] has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all," and may be sanctioned under Rule 37(d)); FED. R. CIV. P. 37(d) (where person designated under Rule 30(b)(6) fails, after being served with proper notice, to appear for deposition, court may order sanctions under Rule 37(b)(2)(A)(i)-(vi)).   From the sanctions available under Rule 37, Plaintiffs ask that the Court choose to strike

---

[6]   DA's Office Systems Support Manager Jaime Guerrero was not among the five witnesses designated in defense counsel's July 6, 2017 email, but testified on the County's behalf on the noticed topic of "[t]he County's efforts to locate and preserve documents and tangible things for this litigation[,] especially email on any server other than the County's server."   *See* (Dkt. No. 36, Attachments 1, 4; Dkt. No. 47, Exh. 5, GUERRERO DEP. at p. 6).

[7]   In relevant part, Rule 30(b)(6) states that a party's notice or subpoena may name an entity as a deponent and "must describe with reasonable particularity the matters for examination," upon which the entity must then designate one or more persons to testify on its behalf and "may set out the matters on which each person designated will testify."   FED. R. CIV. P. 30(b)(6).   Plaintiffs' Notice of Deposition and Defendants' designations complied with this portion of the Rule.

any evidence—more specifically, the affidavits of Sifuentes and Villescas—to the extent that the evidence "refutes, supplements, or otherwise changes the testimony" of the deficient Rule 30(b)(6) witnesses.  (Dkt. No. 36 at § II); *see* FED. R. CIV. P. 37(b)(2)(A)(ii) (sanctions may include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence").

The Court finds that the requested sanctions are not warranted.  In complaining of the dearth of adequate Rule 30(b)(6) testimony, Plaintiffs focus on two of the 28 topics (excluding subparts) on which the six witnesses were designated to testify: Topic 2 pertaining to Plaintiffs' job duties and responsibilities and Topic 8 addressing whether all Plaintiffs (save Maldonado) held jobs that required political allegiance to Rodriguez.  (Dkt. No. 36 at § I; *see* Attachment 1). Assistant District Attorney Josephine Ramirez and Human Resources ("HR") Coordinator (and Plaintiff Cazares's replacement) Rosalinda Cantu were designated to testify as to Topic 2, and Villescas was designated to offer testimony on Topic 8 and Topic 11 addressing whether Maldonado's job required political allegiance.  *See* (Dkt. No. 36, Attachment 2, CANTU DEP. at p. 4; Attachment 3, RAMIREZ DEP. at p. 7; Attachment 4).  Plaintiffs' objections cherry-pick testimony from these and in some cases, other Rule 30(b)(6) witnesses, without acknowledging that the overwhelming majority of the 28 topics on which the six witnesses testified relate to Topics 2 and 8 and to each other—that is, they all pertain to the ultimate question of whether Plaintiffs' terminations, even if political, were permissible under the First Amendment.  *See* (Dkt. No. 36, Attachment 1 at Topics 2, 4, 7, 8, 11, 13, 18, 19, 21-39).  As set forth in detail in the Court's prior order on Defendants' motion to dismiss, this overarching question requires consideration of a multitude of factors.  *See* (Dkt. No. 19 at pp. 11-24; Dkt. No. 47 at ¶ 3).  If, with respect to any particular Plaintiff, the evidence submitted to the Court does not resolve that

question as a matter of law, the remedy for Plaintiffs is a denial of summary judgment, not sanctions.

The same holds true with respect to Plaintiffs' second argument: that various statements in Sifuentes's and Villescas's affidavits should be stricken because they are too conclusory, and not based on personal knowledge.  *See* (Dkt. No. 36 at § III).[8]  To the extent that any of the statements constitutes a conclusion without sufficient factual basis in the record, the Court need not formally strike it; rather, it simply fails to aid in establishing Defendants' entitlement to summary judgment.  The Court also notes that although Rule 56 requires that summary judgment affidavits be based on personal knowledge, both of the targeted affiants are also Rule 30(b)(6) witnesses designated to testify "about information known or reasonably available to" the County itself.  *See* FED. R. CIV. P. 30(b)(6), 56(c)(4); (Dkt. No. 47 at ¶ 11).  In sum, the Court finds that Plaintiffs' objections to Defendants' Rule 30(b)(6) witness testimony and affidavits are more appropriately considered as arguments that Defendants have failed to establish their entitlement to summary judgment.  Accordingly, those objections are mooted by the analysis herein.

## IV.    Defendants' Motion for Summary Judgment

### A.    Overview of Undisputed Facts, Asserted Grounds for Summary Judgment, and Evidence Offered in Support of and in Opposition to the Motion

As explained more fully *infra*, the summary judgment record establishes that all Plaintiffs were, in some way, supporters of longtime DA Guerra in his unsuccessful bid for reelection in 2014.  Defendant Rodriguez defeated Guerra in the Democratic Party primary in March 2014, and terminated all Plaintiffs' employment with the County after he took office as the newly-

---

[8]  As Defendants note, Plaintiffs also lodge hearsay objections on the apparent premise that since Sifuentes and Villescas lack the requisite personal knowledge, their statements must be hearsay.  (Dkt. No. 47 at ¶ 10).  As the Court rejects the premise, for the reasons explained *infra*, Plaintiffs' hearsay objections are also without merit.

elected DA on January 1, 2015.  (Dkt. No. 37, Attachment 9, RODRIGUEZ DEP. at pp. 5, 141).[9]

HIDTA Task Force Commander Dora Munoz lost her job the next day, followed by two other

HIDTA employees on January 8, 2015: Assistant Commander Yates and Intelligence Research

Specialist (and Dora Munoz's sister) Palmira Munoz.  (*Id.*, Attachment 1, DORA MUNOZ DEC. at

¶¶ 20, 23, Exh. 2; Attachment 2, PALMIRA MUNOZ DEC. at ¶¶ 14, 19, 20, Exh. 2; Attachment 3,

YATES DEC. at ¶¶ 5, 12).   Leal and Salazar, both of whom were employed as Criminal

Investigators for the DA's Office, received notice of their terminations on January 8, 2015 and

March 11, 2015, respectively.  (*Id.*, Attachment 4, LEAL DEC. at ¶ 16, Exh. 2; Attachment 6,

SALAZAR DEC. at ¶¶ 3, 8; Dkt. No. 42, Attachment 8 at p. 27).   HR Coordinator Cazares was

terminated on January 28, 2015, and Maldonado learned of her termination from the position of

Administrative Assistant III on August 7, 2015.  (Dkt. No. 37, Attachment 5, CAZARES DEC. at ¶

34, Exh. 7; Attachment 7, MALDONADO DEC. at ¶ 20, Exh. 2).

Plaintiffs' Complaint alleges that their terminations constitute retaliation in violation of

the First Amendment, actionable against the County and Rodriguez under § 1983.  (Dkt. No.

1).[10]  Through their Motion, Defendants request summary judgment on all Plaintiffs' claims for

the following reasons: (1) Rodriguez lacked knowledge of Plaintiffs' alleged political activities

in support of Guerra at the time of their terminations, and therefore could not have retaliated

---

[9]  Rodriguez had no opponent in the general election.  (Dkt. No. 37, Attachment 9, RODRIGUEZ DEP. at p. 5).

[10]  Although the Court's prior order queried whether Rodriguez's alleged designation of Dora Munoz's termination as a "dishonorable" discharge also constituted actionable retaliation, Defendants present uncontested evidence and argument that it does not.  (Dkt. No. 19 at pp. 19-20; Dkt. No. 24 at ¶ 13; *see* Dkt. No. 37).  That is, Defendants offer evidence that the initial report, prepared by HR for Rodriguez's signature and mailed to the Texas Commission on Law Enforcement on January 14, 2015, actually reported a "general" discharge, but was nonetheless in error.  (Dkt. No. 24, Exh. 3, VILLESCAS AFF. at pp. 6, 8-9).  When the error was brought to Rodriguez's attention, he signed a corrected report reflecting an "honorable" discharge, and that correction was mailed on February 3, 2015.  (*Id.* at pp. 6, 10-11).  Defendants' Motion asserts, and Plaintiffs have offered no evidence or argument to dispute, that Dora Munoz suffered no compensable damages under § 1983 as a result of the (quickly corrected) general discharge.  (Dkt. No. 24 at ¶ 13; *see* Dkt. No. 37).

against Plaintiffs on that basis; (2) even assuming that Rodriguez had the requisite knowledge, Plaintiffs occupied positions that required political affiliation with or loyalty to him, and were the type of employees lawfully subject to political dismissals; and (3) even assuming that a genuine issue of material fact exists on the first two issues, Rodriguez in his individual capacity is entitled to qualified immunity.  (Dkt. No. 24).  Defendants support their Motion with the affidavits of Rodriguez and, as discussed *supra*, the County's Rule 30(b)(6) witnesses Sifuentes and Villescas.  (*Id.*, Exhs. 1-3).  In response, Plaintiffs offer the sworn declarations of each of the Plaintiffs and DA Guerra, excerpts from the depositions of Rodriguez and Rule 30(b)(6) witnesses Sifuentes, Villescas, and Eric Schreiber,[11] Defendants' initial disclosures, and documents produced by the County in discovery.  (Dkt. No. 37, Attachments 1-7, 9, 10, 13, 15, 16; Dkt. No. 42, Attachment 8; *see also* Dkt. No. 44).

## B.    Defendants' Challenge to "Causation" Element

As set forth in the Court's order on Defendants' motion to dismiss, Plaintiffs' Complaint lists specific activities constituting each Plaintiff's support for Guerra during the 2014 campaign, and also alleges that Plaintiffs' support was "well-known" or "widely known" to the community and to Defendants.  *See* (Dkt. No. 1 at ¶¶ 28, 36, 49, 54, 65, 73, 82; Dkt. No. 19 at § II). Defendants do not dispute that the activities described in the Complaint are constitutionally protected, and in fact "there can be no question that…campaigning for a political

---

[11]   As an aid for determining the topics on which Sifuentes, Villescas, and Schreiber were designated to testify, Plaintiffs also attach their Fifth Amended Notice of Deposition of the County and defense counsel's email designating these witnesses.  *See* (Dkt. No. 37, Attachments 11, 12).  Schreiber, who serves as Chief Assistant District Attorney in the Check Fraud Division, offered testimony on only two topics: (1) the confidential subjects about which Salazar and the employee replacing him advised the DA or any member of the County Commissioners Court; and (2) the specific decisions made by Salazar and his replacement that created or implemented DA's Office or County policy.  (*Id.*, Attachment 11 at Topics 34, 35; Attachment 12; Attachment 15, SCHREIBER DEP. at p. 4).  As discussed *infra*, this testimony is relevant to whether Salazar held a policymaking or confidential position, and is not ultimately determinative of the Motion.

candidate…relate[s] to a matter of public concern" and finds shelter under the First Amendment. *Vojvodich v. Lopez*, 48 F.3d 879, 885 (5th Cir. 1995); *see also Wiggins v. Lowndes Cty., Miss.*, 363 F.3d 387, 390 (5th Cir. 2004) ("Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment."). Rather, Defendants assert that Rodriguez could not have retaliated against them because of their alleged political activities, since he attests in his affidavit that at the time each Plaintiff was terminated, he knew only that Dora Munoz and Cazares had worn t-shirts supporting his opponent. (Dkt. No. 24 at § I, Exh. 1). Otherwise, he "did not have knowledge of the political activities that are described in the Complaint." (*Id.*, Exh. 1).[12]

Defendants' cited authority, although non-binding on the Court, makes the uncontroversial point that "the threshold question [in a § 1983 political retaliation case] is whether the defendants even knew about the political activities of [the plaintiffs]," since if they did not, they could not have retaliated against the plaintiffs for that reason. *E.g.*, *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004); *see id.* at § I. More accurately, this threshold "knowledge" question constitutes one aspect of the requirement, in any First Amendment retaliation case, that the plaintiff show that his or her protected activity motivated the adverse employment action. *See*, *e.g.*, *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013). Defendants submit that "the only knowledge of Plaintiffs' political activity that is of any consequence in this case is Rodriguez's knowledge, if any; for he possessed the sole discretion to terminate Plaintiffs' employment." (Dkt. No. 24 at § I) (citing Tex. Gov't Code § 41.105) ("All personnel of a prosecuting attorney's office are subject to removal at the will of the prosecuting attorney.")). Therefore, the absence of knowledge on his part requires summary judgment on Plaintiffs'

---

[12]  As Defendants' Motion points out, the Complaint includes wearing pro-Guerra t-shirts in Dora Munoz's list of activities, but not in Cazares's list. (Dkt. No. 24 at § I n.1); *see* (Dkt. No. 1 at ¶¶ 28, 65).

claims against the County and Rodriguez in both capacities.  *Id.*

The Court agrees with Plaintiffs, however, that the summary judgment record places the causation element in genuine dispute.  *See* (Dkt. No. 37 at pp. 49-70).  The political activities described in the Complaint are now supported and expounded upon by that record, and in particular, by Plaintiffs' sworn declarations.  *See* (*Id.*, Attachment 1, DORA MUNOZ DEC. at ¶¶ 16-19; Attachment 2, PALMIRA MUNOZ DEC. at ¶¶ 11, 13-15; Attachment 3, YATES DEC. at ¶ 10; Attachment 4, LEAL DEC. at ¶¶ 4, 10-14, Exh. 1; Attachment 5, CAZARES DEC. at ¶¶ 35-39, Exh. 8; Attachment 6, SALAZAR DEC. at ¶ 5; Attachment 7, MALDONADO DEC. at ¶¶ 6-13, Exh. 1).  Notably, these declarations provide evidence of the facts of which Rodriguez *admits* having knowledge: that Dora Munoz and Cazares wore t-shirts in support of Guerra.  (*Id.*, Attachment 1, DORA MUNOZ DEC. at ¶ 16; Attachment 5, CAZARES DEC. at ¶¶ 38, 39, Exh. 8).  Since Defendants do not dispute that wearing a t-shirt in support of a political candidate qualifies as activity protected by the First Amendment, Rodriguez's admission concedes the knowledge aspect of the causation element.  Moreover, even if it did not, Dora Munoz and Cazares have each attested that Rodriguez knew them and saw them at campaign-related events where they were supporting Guerra, and in doing so have at least called into question Rodriguez's disavowal of knowledge.  (*Id.*, Attachment 1, DORA MUNOZ DEC. at ¶ 17; Attachment 5, CAZARES DEC. at ¶¶ 38, 39, Exh. 8).  The same is true with regard to Leal and Maldonado; the former attests that Rodriguez knew him and saw him entering and leaving a debate with Guerra, and the latter states that she and Rodriguez have known each other for years, and that he came by and greeted her when she was the lone Guerra supporter volunteering at a polling site.  (*Id.*, Attachment 4, LEAL DEC. at ¶ 12; Attachment 7, MALDONADO DEC. at ¶¶ 9, 10).

None of the remaining three Plaintiffs—Yates, Palmira Munoz, and Salazar—state that

Rodriguez had direct awareness of their political support of Guerra.[13]   However, "direct evidence in proving illegitimate intent is not required to avoid summary judgment in unconstitutional retaliation claims; circumstantial evidence will suffice." *Fowler v. Smith*, 68 F.3d 124, 127 (5th Cir. 1995).   In fact, "direct evidence of improper motive is usually difficult, if not impossible, to obtain and requiring direct evidence would effectively insulate from suit public officials who deny an improper motive in cases such as this." *Id.*   In varying degrees, Yates, Palmira Munoz, and Salazar provide evidence that they engaged in visible political support of Guerra, and that other County employees and/or relatives of Rodriguez knew of their particular allegiance.   (Dkt. No. 37, Attachment 2, PALMIRA MUNOZ DEC. at ¶¶ 11, 15; Attachment 3, YATES DEC. at ¶ 10; Attachment 6, SALAZAR DEC. at ¶ 5).   Regardless of whether this evidence, standing alone, places Rodriguez's knowledge of their political activities in genuine dispute, it at least constitutes evidence that Rodriguez had occasion to learn that these Plaintiffs supported his opponent, and must be considered in conjunction with other evidence relevant to the larger issue of causation.   *See Vojvodich*, 48 F.3d at 886 (relying in part on evidence that plaintiff's political support of incumbent candidate defeated in election for sheriff "was well known within [the sheriff's office] generally, and in particular by [the prevailing candidate's] supporters there," in finding fact issue on causation); *Bosque v. Starr Cty.*, 630 F. App'x 300, 305-06 (5th Cir. 2015) (considering circumstantial evidence of knowledge as part of record raising fact issue on causation).   Moreover, in the absence of direct evidence, courts employ a well-established

---

[13]   The record does, however, contain direct evidence regarding another basis for Palmira Munoz's retaliation claim, as indicated in the Complaint: that she was targeted because of her association with her sister, Dora Munoz, a known Guerra supporter.   *See* (Dkt. No. 1 at p. 1, ¶¶ 56, 87-89).   Relevant to this allegation, the sisters attest that Rodriguez and Palmira were friends, and that he knew that she and Dora were sisters.   (Dkt. No. 37, Attachment 1, DORA MUNOZ DEC. at ¶ 20; Attachment 2, PALMIRA MUNOZ DEC. at ¶¶ 13, 14).   Thus, to the extent that Palmira's association with her sister constitutes a basis for her First Amendment retaliation claim, evidence exists that Rodriguez knew of that association, and again, that he knew of Dora Munoz's support of his opponent during the 2014 election campaign.

burden-shifting framework: if the plaintiff meets his or her burden to show that activity protected under the First Amendment was a "substantial" factor, or in other words, a "motivating" factor in the defendant's adverse action, the defendant must then show, "by a preponderance of the evidence, that [he] would have taken the same adverse employment action even in the absence of the protected [activity]," after which the plaintiff may refute that showing with evidence that the defendant's "ostensible explanation for the [adverse action] is merely pretextual."  *Mt. Healthy City. Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Haverda*, 723 F.3d at 591-92 (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)).  Defendants do not engage this framework, *see* (Dkt. Nos. 24, 51), but when applied to the summary judgment record, it reveals genuine issues of material fact on the ultimate question of whether each Plaintiff's political support of Guerra motivated Rodriguez's decisions to terminate their employment.

The Fifth Circuit has recognized that an employee may meet his or her initial burden with evidence of "temporal proximity" between the protected activity and the adverse action at issue, or if the timing "is not close enough without other evidence of retaliation," with evidence of "an employment record that does not support dismissal[.]"  *Feist v. Louisiana*, *Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454-55 (5th Cir. 2013) (Title VII and ADA case).[14] Here, evidence exists that Yates, Palmira Munoz, and Salazar, and in fact all Plaintiffs save Leal, had been employed by the County and/or the DA's Office for close to or more than a decade,[15]

---

[14]  Although *Feist* and other cases cited herein involve claims of retaliation under other federal statutes— namely, Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Pregnancy Discrimination Act ("PDA")—such cases involve a similar burden-shifting framework and are instructive regarding the type of evidence sufficient to raise a fact issue on the causation element in this case. *See Feist*, 730 F.3d at 454; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (Title VII case); *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1345 (2015) (ADA and PDA case).

[15]  Cazares was employed with the DA's Office for more than 30 years, Dora Munoz for over 20 years, Palmira Munoz for approximately 13 years, Yates and Salazar for almost 10 years, Maldonado for a little more than four years, and Leal for approximately three years. *See* (Dkt. No. 37, Attachment 1, DORA

that all had unblemished disciplinary records under Guerra,[16] and that Rodriguez terminated all seven of them within days or months after taking office with no reason given them or officially documented other than that their employment was "at will."  *See* (Dkt. No. 37, Attachment 1, DORA MUNOZ DEC. at ¶¶ 2, 23, Exhs. 2, 9; Attachment 2, PALMIRA MUNOZ DEC. at ¶¶ 1, 10, 19-22, Exhs. 2, 3; Attachment 3, YATES DEC. at ¶¶ 2, 4, 9, 12; Attachment 4, LEAL DEC. at ¶¶ 5, 16, 17, Exh. 2; Attachment 5, CAZARES DEC. at ¶¶ 1, 25, 26, 33, 34, Exh. 7; Attachment 6, SALAZAR DEC. at ¶¶ 1, 6, 8, 9; Attachment 7, MALDONADO DEC. at ¶¶ 1, 20, Exhs. 2, 3; Attachment 13, GUERRA DEC. at ¶¶ 16, 22; Dkt. No. 42, Attachment 8 at p. 27).  Rodriguez waited the longest to terminate Maldonado's employment—approximately six months—but Maldonado offers an explanation not inconsistent with the motive alleged: that prior to Rodriguez taking office, Maldonado had been the sole employee tasked with the Civil Asset Forfeiture Section's computer software transition, that she was the lone employee with the expertise to timely complete it, and that Rodriguez placed "an inordinate amount of pressure" on her to complete the transition sooner than projected and fired her when it was done.  (Dkt. No. 37, Attachment 7, MALDONADO DEC. at ¶¶ 14, 19, 20, 27; *see also* Attachment 5, CAZARES DEC. at ¶ 31).  In other words, he kept her only as long as she was "essential."  *See* (*Id.*, Attachment 7, MALDONADO DEC. at ¶ 20).  A Texas DA's statutory right to terminate his employees at his will does not

---

MUNOZ DEC. at ¶¶ 2, 23; Attachment 2, PALMIRA MUNOZ DEC. at ¶ 1; Attachment 3, YATES DEC. at ¶ 2; Attachment 4, LEAL DEC. at ¶¶ 1, 4, 5, 16; Attachment 5, CAZARES DEC. at ¶ 1; Attachment 6, SALAZAR DEC. at ¶ 1; Attachment 7, MALDONADO DEC. at ¶ 1).  Maldonado's employment with the County, including the DA's Office, spanned over 20 years, and Leal had been employed by the County for approximately five years at the time of her termination.  (*Id.*, Attachment 4, LEAL DEC. at ¶¶ 1, 4, 5; Attachment 7, MALDONADO DEC. at ¶ 1).

[16]  Guerra attests that he served as DA from 1982 through December 2014, and that he is familiar with Plaintiffs and their past employment with the DA's Office.  (Dkt. No. 37, Attachment 13, GUERRA DEC. at ¶¶ 1, 2).  He claims that during his tenure, Plaintiffs "were never written up or disciplined for their job performance," and "[i]n fact, many of them received certificates of appreciation or letters of recommendation for their work there."  (*Id.* at ¶ 16).  Plaintiffs Dora Munoz, Yates, and Cazares all attest that they received certificates of appreciation and/or awards while employed by the County.  *See* (*Id.*, Attachment 1, DORA MUNOZ DEC. at ¶¶ 2, 5; Attachment 3, YATES DEC. at ¶ 3; Attachment 5, CAZARES DEC. at ¶ 33).

equate to a right to do so with retaliatory motive, and in this case, the Court finds the summary judgment evidence sufficient to call that motive into question. *See Vojvodich*, 48 F.3d at 883, 886 (in combination with circumstantial evidence of knowledge, evidence that newly-elected sheriff took adverse actions against plaintiff and other employees who had opposed his election within three and a half months of taking office, that plaintiff had record of satisfactory performance evaluations, and that sheriff had not alerted plaintiff to any performance issues prior to the adverse action, sufficed to raise inference of retaliatory motive).

In excerpts from Rodriguez's deposition testimony provided by Plaintiffs, he claimed that with the exception of his advance decision to replace Dora Munoz with his own HIDTA Commander, Jose Delgado, because he "wanted to bring in someone else" for the job, he relied on: (1) discussions with Villescas in making the decision to fire Cazares; (2) the recommendations of Delgado to terminate the other HIDTA and Investigator Plaintiffs; and (3) the recommendation of Cazares's replacement, HR Coordinator Cantu, to terminate Maldonado's employment. (Dkt. No. 37, Attachment 9, RODRIGUEZ DEP. at pp. 94-95, 105, 109, 113-17, 137-39, 151, 157). In addition to this generalized claim of reliance on others, and as discussed more fully *infra*, his assertion that as the new DA he could choose the employees he wanted "in certain positions, especially in [Plaintiffs'] positions,"[17] Rodriguez testified to more specific, underlying reasons for his decisions to terminate the employment of four of the Plaintiffs: (1) Rodriguez thought Cazares was "disorganized" and lacked "motivation" and "enthusiasm"; (2) new HIDTA Commander Delgado recommended Palmira Munoz's termination due to concerns that she had been supervised by her sister; (3) Delgado recommended Salazar's termination for "being uncooperative or not following instructions"; and (4) HR Coordinator Cantu recommended by

---

[17] This assertion is relevant to Defendants' alternative claim that since Plaintiffs occupied positions that require political loyalty, they are exempt from protection under the First Amendment.

letter that disciplinary action be taken against Maldonado, "up to and including termination," because Maldonado's "verbal abuse and inappropriateness" had led another employee, Elisa Rangel, to threaten resignation, and because other employees felt "uncomfortable and afraid around her" after a series of incidents occurring from April to July 2015.  (*Id.*, Attachment 9, RODRIGUEZ DEP. at pp. 35, 91-94, 113-14, 122-23, 150-51, 157; Dkt. No. 42, Attachment 8 at pp. 4-5).

To the extent that Rodriguez's proffered explanations shift the burden back to Plaintiffs, the Court finds that evidence meeting Plaintiffs' initial burden, along with other statements drawn from their declarations and the deposition testimony provided to the Court, combine to to raise the inference of pretext.  *Burdine*, 450 U.S. at 255 n.10 (Title VII case) (evidence meeting initial burden "and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual.").[18]  First of all, the Court notes that with respect to all of the Plaintiffs allegedly terminated, at least in part, because of specific concerns about them, evidence that no one advised them of these concerns prior to their terminations aids in raising that inference.  *See Vojvodich*, 48 F.3d at 883, 886 (in denying summary judgment on issue of causation, finding relevant that defendant never expressed any dissatisfaction with plaintiff's performance before taking adverse action against him, allegedly for performance reasons).

Other evidence appears inconsistent with Rodriguez's explanations.  Villescas testified that Rodriguez disclosed his intention to fire Cazares shortly after taking office because "[h]e already had…in his mind" that "he didn't feel the loyalty and the trust that he [thought] he deserve[d]" from Cazares, and that although Rodriguez followed Villescas's recommendation to "see how it goes and if you can develop trust," ultimately Rodriguez could not do so and decided

---

[18]  *See supra* n. 14.

to replace Cazares.  (Dkt. No. 37, Attachment 10, VILLESCAS DEP. at pp. 60-66, 86).  Villescas's

claim that Rodriguez alone made the ultimate firing decision, and Cazares's claim that Rodriguez

had little interaction with him before making it, raises a question as to the extent of Rodriguez's

reliance on Villescas, and whether Rodriguez's stated observations of Cazares were developed

on the job or predetermined.  (*Id.*, Attachment 5, CAZARES DEC. at ¶¶ 41, 42; Attachment 10,

VILLESCAS DEP. at pp. 59, 62).

With respect to his claimed reliance on Delgado's concerns about Palmira Munoz,

Rodriguez admitted that he currently employs his aunt who supervises another family member—

a fact also acknowledged by Cazares, who further claims that Rodriguez hired a married couple

and gave the husband supervisory authority over the wife.  (*Id.*, Attachment 5, CAZARES DEC. at

¶ 32; Attachment 9, RODRIGUEZ DEP. at pp. 123-24).  Moreover, the fact that Dora Munoz was

no longer employed at the time of Palmira Munoz's termination casts doubt on whether Dora's

supervisory authority served as the impetus for Palmira's firing.  Rodriguez admitted that he

never saw any "write-up" documenting Delgado's alleged issues with Salazar, and the record

contains additional testimony disclaiming the existence of performance problems underlying

Delgado's alleged recommendations to terminate the other HIDTA/Investigator Plaintiffs, Yates

and Leal.  *See* (*Id.*, Attachment 9, RODRIGUEZ DEP. at pp. 109-115; Attachment 16, SIFUENTES

DEP. at pp. 23-24).[19]  Cazares offers other evidence of pretext as to the HIDTA and Investigator

Plaintiffs: that while still employed as HR Coordinator, and with Rodriguez's tacit approval, he

was asked to accompany Villescas to deliver termination letters to Dora Munoz, Yates, Palmira

Munoz, and Leal, and that each time Villescas told him something to the effect of, "Rog, this is

---

[19]  Plaintiffs accuse Defendants of thwarting any attempt to secure testimony from Delgado on the reasons
for his recommendations by failing to include Delgado's contact information in their initial disclosures.
(Dkt. No. 37 at p. 66, Attachment 14).  Regardless, the absence of testimony from Delgado inures to
Plaintiffs' benefit at this stage.

going to come back to bite us."  (*Id.*, Attachment 5, CAZARES DEC. at ¶¶ 24-26).[20]  According to

Cazares, he had no involvement in the decisions to terminate any of these individuals, and was

never told why those decisions were made.  (*Id.*).  Cazares also accompanied Villescas and

Delgado to deliver a termination letter to HIDTA Agent Mike Garcia, who had supported

Rodriguez in the 2014 election, and who got his job back several months later.  (*Id.* at ¶ 27).

Rodriguez testified that he both fired and rehired Garcia on Delgado's recommendation, and that

he did not know that Garcia had supported him at the time he made those decisions.  (*Id.*,

Attachment 9, RODRIGUEZ DEP. at pp. 115-16).  Yates, however, knew about Garcia's political

alignment when he and Garcia worked together, and stated that Garcia and two other HIDTA

agents who supported Rodriguez are still employed.  (*Id.*, Attachment 3, YATES DEC. at ¶ 10).

Leal, too, claimed that he worked alongside two investigators who did not support Guerra in the

election, and who retained their employment when Rodriguez took over as the new DA.  (*Id.*,

Attachment 4, LEAL DEC. at ¶ 17).

　　　　Maldonado claims that it was during the course of this litigation that she first learned of

the alleged reasons underlying her termination, *i.e.*, Rangel's complaints and the other incidents

listed in Cantu's letter: (1) that Maldonado "rudely" told other employees conversing in front of

her workstation that "people are trying to work here"; (2) that she told Rangel that it was not

---

[20]   Defendants object to Villescas's alleged statement as inadmissible hearsay.  (Dkt. No. 50 at ¶ 19).
However, given Villescas's alleged role in these Plaintiffs' terminations, and that he was designated by
the County to testify as to facts supporting Plaintiffs' dismissals on political grounds, what Villescas
allegedly told Cazares about these dismissals constitutes a statement by a party opponent admissible
against the County.  *See* FED. R. EVID. 801(d)(2)(D) (statement not hearsay if it "is offered against an
opposing party and…was made by the party's agent or employee on a matter within the scope of that
relationship and while it existed"); *Jackson v. Lowndes Cty. Sch. Dist.*, 126 F. Supp. 3d 772, 781 (N.D.
Miss. 2015) (since declarants "were agents of the school district and directly involved in the employment
decision at issue, …their alleged statements [indicating retaliatory reason for adverse action] qualify as
statements of a party opponent for summary judgment purposes such that Plaintiff's deposition testimony
on this point is not hearsay").  In any event, the Court's findings on the causation element of Plaintiffs'
claims do not turn exclusively on its consideration of Villescas's alleged statement.

Rangel's or Maldonado's duty to announce victims or visitors coming in to see the Victims Assistance Coordinator; (3) that she removed a reassigned employee's nametag from his door and replaced it with the name of the newly assigned employee; and (4) that she sprayed too much air deodorizer in the office with the apparent intent to convince other employees to complain about another employee's body odor.  (*Id.*, Attachment 7, MALDONADO DEC. at ¶ 21; Dkt. No. 42, Attachment 8 at pp. 4-5).  Maldonado either disputes that these incidents occurred in the manner described in the letter or that they warranted termination without first speaking to her about these issues.  (Dkt. No. 37, Attachment 7, MALDONADO DEC. at ¶¶ 21-25).  Although Rodriguez testified that he spoke to Rangel when she came to talk to him about resigning, he admitted that he never talked to Maldonado about any of the issues contained in the letter, and did not know whether Cantu had done so, when he opted to fire her.  (*Id.*, Attachment 9, RODRIGUEZ DEP. at pp. 151, 155-57).  That Rodriguez chose to take the ultimate disciplinary action without investigating Rangel's complaints, and the seemingly minor incidents documented in Cantu's letter, at least calls into question whether performance issues served as a mask for retaliation.  *See Young*, 135 S. Ct. at 1356 (Alito, J., concurring) (ADA and PDA case) (factfinder may infer pretext "when an employer claims to have made a decision for a reason that does not seem to make sense").[21]

Finally, although Rodriguez claimed that he had "not let go of anyone…because they supported Mr. Guerra," he also testified that "trust" was necessary for all Plaintiffs' positions and that political support for his opponent "matters…as to the trust in the office."  (Dkt. No. 37, Attachment 9, RODRIGUEZ DEP. at pp. 35, 44).  Assuming that Plaintiffs were not lawfully subject to political dismissals, this testimony provides some additional indication of a retaliatory motive for all Plaintiffs' terminations.  In the end, the Court must be mindful that that

---

[21] *See supra* n. 14.

"[s]ummary judgment should be used most sparingly in...First Amendment cases...involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities." *Haverda*, 723 F.3d at 592 (quoting *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 600 (5th Cir. 2001)).  Whether Rodriguez had knowledge of Plaintiffs' political support of his opponent, and whether that knowledge motivated Plaintiffs' terminations, are fact-intensive inquiries best left to a jury.  *See id.* (citing 10B *Charles Alan Wright & Arthur R. Miller et al.*, *Federal Practice and Procedure* § 2732.2 (3d ed. 2013)) ("[C]laims requiring a determination regarding intentions or motives are particularly unsuitable for summary adjudication....").

## C.   Whether Plaintiffs Held Positions Subject to Political Dismissals

### 1.   Overview of Applicable Law

As set forth in the Court's previous order, the U.S. Supreme Court has consistently held that "the First Amendment forbids government officials to discharge…public employees solely for not being supporters of the political party in power, *unless* party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)) (emphasis added).  "Although the Supreme Court's decisions involve party affiliation, [the Fifth] Circuit has recognized that the *Elrod-Branti* doctrine [also] applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party." *Jordan v. Ector Cty.*, 516 F.3d 290, 295-96 (5th Cir. 2008) (quoting *Correa v. Fischer*, 982 F.3d 931, 935 (5th Cir. 1993)) (internal quotations omitted).  In a separate set of cases, the Supreme Court has also held that the First Amendment precludes the discharge of public employees for exercising their First Amendment right to free speech if two criteria are satisfied: (1) the speech relates to a matter of public concern; and (2) the employee's interest in

commenting upon matters of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees. *Brady v. Ft. Bend Cnty.*, 145 F.3d 691, 704 (5th Cir. 1998) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983)).

Interpreting this precedent, the Fifth Circuit "places cases involving only political association, only speech, or a combination of the two on a spectrum." *Gentry v. Lowndes Cty.*, 337 F.3d 481, 485-86 (5th Cir. 2003) (citing *Kinsey v. Salado Indep. Sch. Dist.*, 950 F.2d 988, 993-94 (5th Cir. 1992) (en banc)). "Where nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any, weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail." *Id.* at 486 (citing *Kinsey*, 950 F.2d at 993-94; *McBee v. Jim Hogg Cnty.*, 730 F.2d 1009, 1014 (5th Cir. 1984)) (internal footnote omitted). On the opposite end of the spectrum "are cases where employees' exercise of First Amendment privileges 'clearly over-balanced [the employees'] usefulness.'" *Id.* (quoting *McBee*, 730 F.2d at 1014). When cases fall within the spectrum, *Pickering-Connick* balancing constitutes the appropriate inquiry. *Brady*, 145 F.3d at 705; *see also id.* "[A] number of factors are relevant in balancing the interests of the individual against those of the state, including the following: (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; [and] (5) whether the activity impairs discipline by superiors or harmony among coworkers." *Brady*, 145 F.3d at 707.

In cases involving public employees who hold policymaker or confidential positions, "the government's interests more easily outweigh the employee's (as a private citizen)." *Id.* at 707-08 (quoting *Kinsey*, 950 F.2d at 994). "A policymaker is an employee 'whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors.'" *Wiggins v. Lowndes Cty.*, 363 F.3d 387, 390 (5th Cir. 2004) (quoting *Stegmaier v. Trammell*, 597 F.2d 1027, 1035 (5th Cir. 1979)). "[C]onsideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Id.* (quoting *Elrod*, 427 U.S. at 368). "An employee is confidential 'if he or she stands in a confidential relationship to the policymaking process, e.g., as an advisor to a policymaker, or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, e.g., as a private secretary to a policy maker." *Id.* at 391 (quoting *Stegmaier*, 597 F.2d at 1040). In *Stegmaier*, the Fifth Circuit "added to this definition the possibility that a confidential employee may be one who is in a position to subject an elected official to personal liability." *Id.* (citing same). Ultimately, however, the inquiry "is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that [political] affiliation is an appropriate requirement for effective performance of the public office involved." *Brady*, 145 F.3d at 709 (quoting *Branti*, 445 U.S. at 518).

## 2.    Balancing Test As Applied to Plaintiffs at Summary Judgment Stage

Consistent with Plaintiffs' allegations at the Rule 12(b)(6) stage, the summary judgment record provides no indication that any Plaintiff's support for Guerra was solely a privately held

belief—all attest that they engaged in some form of public support for Guerra in his 2014 reelection campaign—or that any Plaintiff occupies a place on the other end of the spectrum. *See* (Dkt. No. 19 at p. 14).   Therefore, the *Pickering-Connick* balancing test determines the outcome of Defendants' argument that Plaintiffs held positions subject to political dismissals. Under that balancing test, since precedent establishes that "campaigning for a political candidate…relate[s] to a matter of public concern" and is protected by the First Amendment, *Vojvodich*, 48 F.3d at 885, Defendants may prevail only by establishing that Plaintiffs' protected interest is outweighed by the County's "interest in promoting the efficiency of the public services it performs through" Plaintiffs' jobs, *Brady*, 145 F.3d at 704, and more specifically in this case, that political affiliation with Rodriguez was "an appropriate requirement for effective performance" of those jobs, *id.* at 709.   Although this showing entails consideration of multiple factors, Defendants' Motion focuses exclusively on their attempt to establish Plaintiffs' former jobs as policymaker or confidential positions within the DA's Office, relying on the affidavits of two of the County's Rule 30(b)(6) witnesses: (1) current HIDTA Commander Sifuentes, who describes the job duties and responsibilities of the HIDTA Plaintiffs—namely, his predecessor Dora Munoz, Assistant Commander Yates, and Intelligence Research Specialist Palmira Munoz, with reference to these Plaintiffs' attached official job descriptions; and (2) First Assistant Villescas, who details the job duties of Investigator Plaintiffs Leal and Salazar, HR Coordinator Cazares, and Administrative Assistant III Maldonado.  (Dkt. No. 24, Exhs. 2, 3).[22]  The affidavits attempt to describe how each Plaintiff's job bears the hallmarks of a policymaking or confidential position, as defined by precedent, and Plaintiffs dispute these characterizations with evidence of their own—chiefly, their sworn declarations and that of former DA Guerra.  *See*

---

[22] Villescas's affidavit does not attach copies of these Plaintiffs' official job descriptions.  *See* (Dkt. No. 24, Exh. 3).

(Dkt. No. 37, Attachments 1-7, 13).  Upon careful consideration of all of the evidence submitted by the parties, the Court finds it appropriate to observe only that the dispute is a highly fact-intensive one that should not, and in any event, need not be decided at this stage, since even assuming that each Plaintiff held a policymaking or confidential position at the time he or she was fired, the record as a whole does not establish a balancing in Defendants' favor as a matter of law on the overarching issue of whether Plaintiffs' jobs required political allegiance to Rodriguez.  The Court concludes that this highly fact intensive decision involving, amongst other things, determinations of witness credibility is best left to a jury to decide.

The County designated Villescas to testify on this overarching topic as to all Plaintiffs, and although he repeatedly emphasized Rodriguez's right to employ trusted, loyal individuals with "political allegiance" to him, especially in Plaintiffs' positions, as a whole his testimony merely reaffirms what the Texas legislature has already determined: that when Rodriguez took office as DA, he had the right to "employ the assistant prosecuting attorneys, investigators, secretaries, and other office personnel that in his judgment are required for the proper and efficient operation and administration of the office," TEX. GOV'T. CODE § 41.102(a), and to remove any such personnel at his will, *id.* § 41.105.  *See* (Dkt. No. 37, Attachment 11 at Topics 8, 11; Attachment 12).  Villescas explained that from his perspective, "political allegiance" does not refer to activities such as "endorsing a candidate," "holding a sign," and "working polls"— activities in which Plaintiffs engaged, to varying degrees; rather, it "refer[s] more to the allegiance that the [DA], himself, would feel [from] an individual, as to whether or not the [DA] himself feels that that person has loyalty to him, and whether or not he could trust that individual."  (*Id.*, Attachment 10, VILLESCAS DEP. at pp. 32-33).  He repeated this distinction, at one point explaining that whether an employee can do his or her job after "openly supporting a

different [candidate]" is "totally…separate" from the DA "having that level of trust that he feels from that individual." (*Id.* at p. 39). When confronted with the County Personnel Policy Manual provision stating that no employee "shall…be disciplined in any fashion for failure to participate in [political campaigns, political services, or related activities]," Villescas admitted that the Policy applied to all DA's Office employees, but claimed that he "[didn't] read political allegiance anywhere in those statements." (*Id.* at pp. 37, 46-47; Dkt. No. 42, Attachment 8 at p. 13). Rather, to him, political allegiance means "the extent that the…[DA], himself, feels that level of trust and confidence and loyalty…irrespective of whether [the individual] voted for him or not." (Dkt. No. 37, Attachment 10, VILLESCAS DEP. at p. 48). Consistent with this description of political allegiance and loyalty, Villescas was candid in conceding that Plaintiffs did not have to support Rodriguez's campaign in order to do their jobs. (*Id.* at pp. 36, 43-47, 54-55, 58, 71).

Sifuentes, who the County designated to testify on the topic of whether Dora Munoz and Yates each occupied "one of the highest positions in the Office, a position that requires the upmost trust, loyalty, and confidence," testified similarly. *See* (*Id.*, Attachment 11 at Topic 7C, Attachment 12). He explained that the trust, loyalty, and confidence required of the HIDTA Commander and Assistant Commander, and in fact all HIDTA employees, are owed to the County regardless of who may be serving as DA, and that it was not a requirement of his job that he give political allegiance to Rodriguez. (*Id.*, Attachment 16, SIFUENTES DEP. at pp. 18-22).

Like Villescas, Rodriguez globally asserted that trust and loyalty to his objectives and goals were necessary for all Plaintiffs, and as the Court noted in its discussion of the evidence relevant to the causation element, he also indicated that political support for his opponent "matters…as to the trust in the office." (*Id.*, Attachment 9, RODRIGUEZ DEP. at pp. 35, 41-44).

However, he stopped short of claiming that political support of either candidate determines whether the requisite trust and loyalty can exist, stating, for example, that "if there's somebody…already [employed by the DA's Office], and that person supported whoever they want to support, that shouldn't be the reason why they should be let go." (*Id.* at p. 34). In fact, as noted *supra*, Rodriguez has disclaimed firing anyone because of their political support for Guerra, while also affirmatively claiming that no one "[has] to be a political supporter of Ricardo Rodriguez" to do his or her job—not even, apparently, his First Assistant Villescas and chosen HIDTA Commander Delgado whose allegiance in the election was allegedly unknown to Rodriguez at the time he hired them, and on whom he allegedly relied in making most of the termination decisions at issue in this case. (*Id.* at pp. 35, 37, 56, 125).

In light of the above, the Fifth Circuit's decision in *Brady*, *supra*, on which the Court relied at the pleading stage, remains instructive. Like the seven Plaintiffs in this case, the seven sheriff's deputy plaintiffs in *Brady* held various (and in some cases, managerial or supervisory) titles at the time of the adverse actions at issue: lieutenant of the sheriff's department detective bureau, detective sergeant in narcotics, patrol sergeant, lieutenant in charge of the county jail, sergeant, patrol deputy, and sergeant who supervised the warrants division. *Brady*, 145 F.3d at 697. Also like Plaintiffs, "[a]lthough their levels of participation varied," the deputies engaged in proactive, political support of their boss in his campaign for reelection. *Id.* The incumbent sheriff lost the election, and under Texas law, the plaintiffs' terms as deputies expired automatically when the sheriff's tenure of office expired. *Id.* The new sheriff declined to rehire the plaintiffs, who then sued under § 1983, claiming that he had done so on the basis of their political support of his opponent, in violation of the First Amendment. *Id.*

On appeal, the defendant county emphasized that by statute, deputy sheriffs in Texas

"serve[ ] at the pleasure of the sheriff," much like Texas DA's Office personnel serve "at the will" of the DA. *Id.* at 702 (quoting TEX. LOCAL GOV'T CODE § 85.003); TEX. GOV'T CODE § 41.105. This did not equate, however, with a right to engage in patronage practices, since the *Elrod-Branti* doctrine and Fifth Circuit authority interpreting it had long placed limits on those practices. *Id.* at 702. Nor could the county legitimately claim that the automatic expiration of the plaintiffs' terms precluded their First Amendment claims. *Id.* at 702-03. For one, the Supreme Court had "made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." *Id.* at 702 (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

Turning to the county's additional arguments implicating the *Elrod-Branti* doctrine, the Fifth Circuit determined, as this Court has done in the case at hand, that the *Pickering-Connick* balancing test determined the outcome. *Id.* at 703-06. In applying the factors relevant to this test, the Court first described the "wide variety of political activity" in which the plaintiffs engaged, according to their testimony: four of the plaintiffs made, put up, and/or displayed signs or billboards in support of the incumbent sheriff, four walked door-to-door campaigning for him, three attended (and in one case, organized) campaign events, two publicly discussed their support for the sheriff, two wore campaign paraphernalia, one displayed a bumper sticker on his van, and one polled for the incumbent sheriff on election day. *Id.* at 706-07. The Fifth Circuit observed that these activities—found to relate to a matter of public concern—took place while the plaintiffs were off-duty and consisted of positive statements about the incumbent sheriff, rather than negative statements about his opponent; thus, "in no sense could their actions be characterized as hostile, abusive, or insubordinate." *Id.* at 707, 709. Similarly in this case, the

summary judgment record provides no indication that Plaintiffs engaged in anything other than conduct typical of most political campaigns and proactive in nature: telling others of their support and to vote for Guerra, and off-duty activities such as displaying bumper stickers and signs, block-walking, attending campaign events, and wearing t-shirts and caps.

The Fifth Circuit next observed that even "assuming that Plaintiffs' former positions in the sheriff's department could be considered 'policymaking' positions," this determination was not dispositive of the multi-factor balancing inquiry. *Id.* at 709. In light of the sheriff's own testimony that political support of his opponent did not factor into any of his personnel decisions, that not even his lieutenants "needed to support [him]" in the election campaign, and that he would be able to work with someone who had actively supported his opponent, the Court determined that the plaintiffs' political activity "had little if any potential for undermining close working relationships within the sheriff's department or for impairing discipline by superiors or harmony among coworkers within the department," thus tipping the balance in the plaintiffs' favor. *Id.* at 709-10. That is, the plaintiffs' "interest in political activity in support of [the former sheriff] outweighed the County's interest in efficiency in the services that it provides through its employees because any negative impact that the [plaintiffs'] activity could have had on the efficiency of the sheriff's department was minimal, if their activity could have created any such impact at all." *Id.* at 708.

Although this Court "lack[ed] the benefit of the key admission" in *Brady* when conducting the balancing test at the Rule 12(b)(6) stage, the summary judgment record now supplies it. (Dkt. No. 19 at p. 24). That is, Rodriguez both disclaims firing employees because of their political support for his opponent, and observes that no one "[has] to be a political supporter of Ricardo Rodriguez" to do his or her job. He does, as noted, indicate that

employees' political support of his opponent is *a* factor in determining whether they will be trusted employees loyal to his goals and objectives, but his admission that it is not *the* factor, in combination with more definitive Rule 30(b)(6) testimony that political alignment with Rodriguez is not necessary for any of the positions occupied by Plaintiffs, brings this case in close alignment with *Brady*.  Moreover, the summary judgment record otherwise contains no evidence that Plaintiffs' proactive political activities caused any disruption within the DA's Office, and only mild speculation that such activities had the potential to disrupt the efficiency of the services provided through Plaintiffs' jobs.  Notably, the County's own witness on the issue, Villescas, chose not to point to any statement or activity by Plaintiffs indicating that they would be "disruptive" or "disloyal" employees after Rodriguez took office.  (Dkt. No. 37, Attachment 10, VILLESCAS DEP. at pp. 50-54, 67; Attachment 11 at Topic 4; Attachment 12).  Villescas and Defendants' other witnesses did attempt to explain how Plaintiffs were in positions to undermine DA's office policy—an inquiry relevant to the ultimate balancing, *see Wiggins*, 363 F.3d at 391-92—but essentially described the consequences inherent in Plaintiffs doing their jobs badly or unethically, even likening the criminal investigator positions held by Leal and Salazar to those law enforcement officers of the "Panama Unit [who] went rogue and were found guilty of criminal misconduct" and subjected Hidalgo County and its sheriff to civil liability.  (Dkt. No. 24, Exh. 2, SIFUENTES AFF. at pp. 5-6; Exh. 3, VILLESCAS AFF. at pp. 4, 6; Dkt. No. 37, Attachment 9, RODRIGUEZ DEP. at p. 108 & errata sheet; Attachment 10, VILLESCAS DEP. at pp. 26-27, 66-68; Attachment 16, SIFUENTES DEP. at pp. 28-29, 41-42).  The Court's familiarity with the Panama Unit criminal and civil cases allows it to take judicial notice of the fact that the civil lawsuits involved § 1983 claims of unconstitutional conduct by members of that unit, brought against the County and its sheriff under theories of municipal and supervisory liability.  *See*

7:13cv261 *Perez, et al. v. Trevino, et al.*; 14cv438 *Carrizales, et al. v. Trevino, et al.*  Since *Elrod* itself cautioned against using "mere difference of political persuasion" as a basis for imputing poor job performance, the Court finds it prudent not to use Plaintiffs' proactive political support for Guerra to impute the same, much less criminal or unconstitutional conduct. *See Elrod*, 427 U.S. at 365.  Also, the fact that Plaintiffs "could sabotage [their] own work" by performing it badly—or, taken to the extreme, by committing crimes or violating the Constitution—does not make their positions political ones, especially given the admission by Defendants' witnesses that many other DA's Office employees had the same or similar ability to "undermine" their jobs.  *See Wiggins*, 363 F.3d at 391-92 (distinguishing employees in positions to undermine policy from those whose sabotage of their own work merely renders their work deficient, subjecting them to less constitutionally-suspect terminations for cause); (Dkt. No. 37, Attachment 9, RODRIGUEZ DEP. at p. 108; Attachment 10, VILLESCAS DEP. at pp. 26-27, Attachment 16, SIFUENTES DEP. at pp. 28-29, 41-42).

In the end, "regardless of whether an employee is a policymaker, a public employer cannot act against an employee because of the employee's affiliation or support of a rival candidate unless the employee's activities in some way adversely affect the government's ability to provide services," and at this stage, the evidence does not make this showing as a matter of law – it is disputed.  *Vojvodich*, 48 F.3d at 887.  Nor does Defendants' cited authority persuade otherwise.  Although *Stegmaier* sanctioned the political dismissal of an Alabama deputy clerk on the basis of the Fifth Circuit's finding that the plaintiff fell within *Elrod*'s confidential employee exception to First Amendment liability, the Supreme Court's later decision in *Branti* clarified that the confidential employee label was not itself dispositive, and Defendants' other cited cases reflect this clarification.  *See Stegmaier*, 597 F.2d at 1040; *Branti*, 445 U.S. at 518; (Dkt. No. 24

at ¶ 16).[23]   *Soderstrum*, a post-*Branti* case also approving of the political dismissal of a confidential employee, reasoned that a Louisiana town's incoming police chief "should not be prevented by the First Amendment from replacing his defeated opponent's secretary and relative, *at least when that person, as in this case, has unambiguously expressed her lack of confidence in the incoming official and her unwillingness to work in the new administration*."   *Soderstrum*, 925 F.2d at 141 (emphasis added).   Here, no evidence exists that any Plaintiff expressed a lack of confidence in Rodriguez or an unwillingness to work with him, and in fact, Dora Munoz attests that she spoke with Rodriguez after his election and assured him of her ability to be loyal to him. *See* (Dkt. No. 37, Attachment 1, DORA MUNOZ DEC. at ¶ 22).   As they did at the pleading stage, Defendants also invoke *Gunaca v. State of Tex.*, 65 F.3d 467 (5th Cir. 1995), in an attempt to argue that the Fifth Circuit's finding that Texas DA's investigators "represent[ ] [the DA] in the eyes of the public"—one of the factors relevant to establishing the "personal staff" exception to liability under Title VII and the Age Discrimination in Employment Act ("ADEA")—should equate to a finding that the Investigator Plaintiffs (to include Dora Munoz, Yates, Salazar, and Leal) occupied confidential positions within the DA's Office.   *See Gunaca*, 65 F.3d at 469-71; (Dkt. No. 24 at ¶¶ 23-27).   Even accepting this argument, however, *Gunaca* does not hold that Texas DA's investigators are subject to political dismissals simply by reason of the office they hold; rather, the Fifth Circuit in *Gunaca* acknowledged the balancing required, but had no reason to engage it in the context of its qualified immunity analysis, since the plaintiff had offered no

---

[23]   Defendants cite to another pre-*Branti* case outside this Circuit, but since this decision did not involve party affiliation, the Seventh Circuit did not consider the *Elrod* exception dispositive; instead, after concluding that the plaintiff, a Milwaukee deputy city attorney, was a policymaking employee within the meaning of *Elrod*, the Court separately weighed the state's interest in permitting the city attorney to fire his deputy "for reasons of personal loyalty" against the deputy's interest in running for office against the express wishes of his boss, and concluded that the state's interest prevailed.   *See Newcomb v. Brennan*, 558 F.2d 825, 829-31 (7th Cir. 1977); (Dkt. No. 24 at ¶ 21).   Again, the case at hand involves only evidence of proactive political support of Rodriguez's opponent, not a refusal to abide by Rodriguez's express wishes.

argument or evidence that he did *not* fall within the *Elrod-Branti* exception to First Amendment liability. *See Gunaca*, 65 F.3d at 474 n.6. In this case, Plaintiffs have offered both argument and evidence to place the ultimate balancing in genuine dispute, and to preclude summary judgment on the issue of whether Plaintiffs held positions subject to political dismissals.

## D.   Whether Rodriguez in His Individual Capacity Is Entitled to Qualified Immunity

With respect to the claims against him in his individual capacity, Rodriguez alternatively invokes the defense of qualified immunity, which "protects government officials from civil damages liability [under § 1983] when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). To overcome this defense, Plaintiffs must show: (1) that Rodriguez violated a constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct. *Id.* at 371 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Since, in close alignment to *Vojvodich*, "a reasonable factfinder could find that political animus motivated [Rodriguez's] actions," and since, "absent a sufficient showing of disruption of the government's ability to provide services, [Plaintiffs'] activity was constitutionally protected" regardless of their status as policymakers or confidential employees, Plaintiffs have met their summary judgment burden on the first prong. *Vojvodich*, 48 F.3d at 886.

With regard to the second prong, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). In asserting that Plaintiffs' First Amendment rights were not clearly established at the time of their terminations, Defendants rely heavily on the Texas statutory provisions discussed *supra*, claiming that these provisions bestow on the DA "the

absolute power to hire and fire subordinates[.]" (Dkt. No. 24 at ¶ 29) (citing TEX. GOV'T. CODE §§ 41.102(a), 41.105).[24]   However, a Texas DA's power to fire employees at his will—that is, "for good cause, bad cause, or no cause at all," *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998)—does not equate to a power to fire them by reason of their political support of his opponent in an election; as the Fifth Circuit noted in *Brady*, the *Elrod-Branti* doctrine and Fifth Circuit authority interpreting it have long placed limits on that power. *Brady*, 145 F.3d at 697.   Nor do the limits on that power dissolve when employees are regarded, however reasonably, as policymaking or confidential employees.   Rather, at the time Rodriguez made the challenged decisions to terminate Plaintiffs' employment, the law was clearly established that the First Amendment protected their political support for Guerra unless their activities in some way adversely affected the ability of the DA's Office to provide services, and at this stage of the case, the record contains no evidence of any such disruption.   *Vojvodich*, 48 F.3d at 886-87 (finding that deputy sheriff's status as policymaker was not dispositive, and in the absence of evidence of disruption, denying qualified immunity to sheriff alleged to have taken adverse action again policymaking deputy for his political support of rival candidate).   The Court recognizes that the doctrine of qualified immunity provides considerable protection to defendants sued individually under § 1983, but in light of the record before the Court, this protection must yield to the one afforded to Plaintiffs: that the class of employees subject to political dismissals is, ultimately, an "exceptional" one.   *Brady*, 145 F.3d at 709 (quoting *Garcia v. Reeves Cty.*, 32 F.3d 200, 205 (5th Cir. 1994)).

---

[24]   Defendants cite to a single case in support of their position, but the Seventh Circuit's decision in *Newcomb*, *supra*, does not aid in delineating clearly-established law in this Circuit, and in any event, is factually distinguishable.   *See id.*

**V.     Conclusion**

Accordingly, the Court hereby **ORDERS** that Defendants' Motion for Summary Judgment is **DENIED**, and Plaintiffs' Motion to Strike and for Sanctions is **MOOT**.

SO ORDERED this 8th day of March, 2018, at McAllen, Texas.

Randy Crane
United States District Judge